820 So.2d 919 (2002)
Lenard James PHILMORE, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1706.
Supreme Court of Florida.
May 30, 2002.
*923 Patrick C. Rastatter of Glass & Rastatter, P.A., Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Marrett W. Hanna, Leslie T. Campbell, and Melanie A. Dale, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Lenard James Philmore for the November 14, 1997, killing of Kazue Perron. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Philmore's convictions and sentence of death.

FACTS
Philmore, who was twenty-one at the time of the commission of the crimes, was charged and convicted of first-degree murder, conspiracy to commit robbery with a deadly weapon, carjacking with a deadly weapon, kidnapping, robbery with a deadly weapon, and third-degree grand theft based upon the events surrounding the November 14, 1997, abduction and murder of Perron.
The evidence presented at trial revealed the following. Philmore and codefendant Anthony Spann[1] wanted money so they could go to New York. On November 13, 1997, Philmore, Spann, and Sophia Hutchins, with whom Philmore was sometimes living, were involved in a robbery of a pawn shop in the Palm Beach area. However, the robbery was unsuccessful. Consequently, Philmore and Spann decided to rob a bank the following day.
On the evening of November 13, Philmore and Spann picked up their girlfriends, Ketontra "Kiki" Cooper and Toya Stevenson, respectively, in Spann's Subaru and stayed at a hotel for the evening. The following morning, Spann told Philmore that they needed to steal a car as a getaway vehicle in order to facilitate the robbery. Spann told Philmore that they would have to kill the driver of the vehicle they stole.
At approximately 11:30 a.m. on November 14, Philmore and Spann dropped their girlfriends off at their houses, and went in search of a car to steal. Philmore and Spann first looked for a car at the Palm Beach Mall, but were unsuccessful. They *924 then followed a woman to another mall, but by the time they reached her car, she was already outside of her car, making it difficult for them to steal the car. They ultimately spotted Perron driving a gold Lexus in a residential community, and the two followed her.
At approximately 1 p.m., Perron entered the driveway of a friend with whom she intended to run errands. Upon entering the driveway, Spann told Philmore to "get her." Philmore approached the driver's side of the vehicle and asked Perron if he could use her phone. Perron stated that she did not live there, and Philmore took out his gun and told Perron to "scoot over." Philmore drove Perron's car, with Spann following in his Subaru. During the drive, Perron was crying and told Philmore that she was scared.
Spann flashed his car lights at Philmore, and the two cars pulled over. Spann told Philmore to "take the bitch to the bank." Philmore asked Perron if she had any money, and Perron responded that she did not have any money in the bank, but that he could have the $40 she had on her. Philmore told her to keep the money. Perron took off her rings, and Philmore placed them inside the armrest of the Lexus.[2] Perron asked Philmore if he was going to kill her, and he said "no." She also asked if Spann was going to kill her, and Philmore again said "no."
Philmore and Spann passed a side road in an isolated area in western Martin County, and Spann flashed his lights, indicating that they turn around and head down the road. Philmore chose the place to stop. Philmore ordered Perron out of the vehicle and ordered her to walk towards high vegetation containing maiden cane, which is a tall brush. Perron began "having a fit," and said "no." Philmore then shot her once in the head. Philmore picked up Perron's body and disposed of it in the maiden cane. Spann did not assist in disposing of the body.
Philmore and Spann then drove the two vehicles to Indiantown, where they stopped at a store. Spann pointed out a bank to rob, and Philmore, following Spann, drove to the bank parking lot. Philmore parked the Lexus a short distance from the bank, and got into Spann's Subaru. At approximately 1:58 p.m., Spann drove Philmore to the bank to commit the robbery. Philmore entered the bank while Spann waited in the car. Philmore grabbed approximately $1100 that a teller was counting and ran out of the bank.[3] After robbing the bank, Philmore and Spann returned to the Lexus, and concealed the Subaru. Philmore threw his tank top out of the Lexus by the side of the road after the robbery and wore Spann's tank top. The discarded tank top, which contained Perron's blood, was subsequently recovered by the authorities.
After concealing the Subaru, Philmore and Spann returned to Palm Beach County to pick up Cooper and Stevenson at their houses. They then went to a fast food restaurant to get food and Cooper's paycheck. Afterwards, Philmore wanted to go to Hutchins' house because he left his shoes there. However, as they approached Hutchins' house, Philmore spotted an undercover police van sitting at a nearby house, and stated that it "looked like trouble." An officer of the West Palm Beach Police Department, who happened to be engaged in a stakeout in the area, *925 observed Spann driving the Lexus and recognized him because there was an outstanding warrant for his arrest on an unrelated matter. Spann sped away and a high-speed chase ensued on Interstate 95.
As the high-speed chase proceeded into Martin County, a tire blew out on the Lexus. Philmore and Spann, followed by Cooper and Stevenson, exited the vehicle and hid in an orange grove. While in the orange grove, Philmore and Spann encountered the manager of the grove, John Scarborough, and his assistant. Although Spann first told Scarborough that they were running from the police because of a speeding incident, when Scarborough expressed his disbelief, Spann said that they were running from the police because of drug-related activities. Spann offered Scarborough money to get them out of the grove, and Scarborough refused. Scarborough drove away and informed the police, who were already searching the grove, where he saw them. Philmore and Spann were apprehended and charged with armed trespass.[4] The authorities recovered firearms from a creek in the orange grove a few days later.
From November 15 through November 26, Philmore gave several statements to the police in which he ultimately confessed that he robbed the bank and abducted and shot Perron.[5] On November 21, Philmore led the police to Perron's body, which was found in the maiden cane. Philmore was charged in a six-count indictment, and the jury found Philmore guilty on all counts.
After a penalty phase in which the State and the defense presented both lay and expert witnesses, the jury recommended a sentence of death by a vote of twelve to zero. The trial court then held a Spencer[6] hearing, allowing both sides to present legal arguments and evidence.[7]
The trial court found the following five aggravators: (1) defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person;[8] (2) the capital felony was committed while the defendant was engaged in the commission of a kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the capital felony was committed for pecuniary gain; and (5) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"). The court found no statutory mitigation,[9] but found the following nonstatutory mitigation: (1) defendant was *926 both the victim and witness of physical and verbal abuse by an alcoholic father (moderate weight); (2) defendant has a history of extensive drug and alcohol abuse (some weight); (3) severe emotional trauma and subsequent posttraumatic stress (moderate weight); (4) defendant was molested or raped, or both, at a young age (some weight); (5) defendant was classified as severely emotionally handicapped (little weight); (6) defendant has exhibited the ability to form close loving relationships (moderate weight); (7) defendant's cooperation with the State (moderate weight); and (8) defendant has expressed remorse for causing the death of Perron (little weight). The trial court rejected the nonstatutory mitigator that the defendant suffered brain damage at an early age. Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court agreed with the jury's recommendation and imposed the death penalty.[10]
On appeal, Philmore raises eleven claims.[11] Although Philmore does not raise the issue of sufficiency of the evidence on appeal, we have an obligation to independently review the record for sufficiency of the evidence. See Sexton v. State, 775 So.2d 923, 933 (Fla.2000). After reviewing the record, we conclude that there is competent substantial evidence to support the murder conviction in this case.

GUILT PHASE ISSUES

1. Suppression of Statements to the Police

In Philmore's first claim on appeal, he challenges the trial court's denial of his motion to suppress various statements he made to law enforcement before he was charged with the first-degree murder of Perron. First, Philmore claims that his statements were not freely and voluntarily given under the Fifth Amendment because Philmore believed that he would not receive the death penalty if he cooperated with authorities. Second, Philmore contends that Assistant Public Defender John Hetherington provided ineffective assistance of counsel under the Sixth Amendment in allowing Philmore to give multiple statements to authorities in which he gradually implicated himself in Perron's abduction and murder.
On November 14, 1997, Philmore was arrested for trespassing on posted land after the police apprehended him and *927 Spann in the orange grove following the high-speed chase in Perron's Lexus. On November 15, 1997, Detective Gary Bach, who was the lead investigator in the Indiantown bank robbery, interviewed Philmore after reading him his Miranda[12] rights. Philmore agreed to waive his rights and admitted that he was in Indiantown at the time of the bank robbery, he was in the bank, and he was in the Subaru that was used as a getaway car. Philmore then stated that he would speak to Detective Bach again, but first wanted to speak with an attorney. Detective Bach terminated the interview, and some time later that day, Hetherington was appointed to represent Philmore.[13]
From November 18 through November 26, 1997, Philmore, in the presence of Hetherington, provided the police with several statements in which he ultimately confessed to the murder and abduction of Perron. However, Hetherington was not present for two statements that were given in conjunction with polygraph examinations.
Philmore was provided Miranda warnings and signed a waiver before providing each statement. On December 16, 1997, Philmore agreed, again in the presence of Hetherington, to go before the grand jury and confess his involvement in the abduction and shooting of Perron.
Philmore filed a pretrial motion seeking to suppress the statements he made while in custody and the admission of evidence obtained from those statements. Philmore contended that he was deprived of the right to effective assistance of counsel as guaranteed by the Sixth Amendment because Hetherington failed to protect Philmore's right to remain silent. Philmore also contended that based upon counsel's ineffectiveness, any statements made were not freely and voluntarily given under the Fifth and Sixth Amendments. Furthermore, Philmore contended that his statements were not freely and voluntarily given because he believed that if he gave a full and honest statement, he would not be subject to the death penalty.
The trial court conducted an evidentiary hearing and ultimately denied Philmore's motion to suppress the statements made to law enforcement on November 18, November 21, and November 26, 1997, but granted the motion with regard to the statements made during the polygraph exams on November 20 and November 23, 1997. The court explained:
[T]he Court finds that with competent assistance of counsel, the Defendant gave free and voluntary statements on November 18th, 1997, November 21st, 1997, and November 26, 1997.
The Court specifically finds that there were no promises made to the Defendant in exchange for his testimony, and there were no threats made, no coercion made to the Defendant in order to get him to make the statements, that he did so on his own free will and again in the presence of a competent counsel as contemplated under the constitution.
With regards to the statements made during the polygraph examination, the Court agrees with Mr. Bauer's recitation of the facts that any free and voluntary waiver of the presence of Mr. Hetherington was specifically conditioned on being questioned and answers *928 given consistent with those that were given during the statements. Moreover, the detective as well as Mr. Hetherington testifiedthat protocol wouldn't allow Mr. Hetherington in the room. And while the Court's aware of the written waiver of the Defendant, it's the Court's view that that does not equate to a free and voluntary waiver of counsel during the time of the polygraph examination.
Accordingly, the Motion to Suppress is denied as it relates to the statements made to law enforcement on November 18th, '97, November 21st, '97, November 26th, '97, is granted as it isrelates to any statement made while with law enforcement in the polygraph room outside of the presence of Mr. Hetherington.
The trial court later denied Philmore's motion to suppress as it related to the December 16, 1997, grand jury testimony.
Turning to the Fifth Amendment issue, we conclude that Philmore's statements were freely and voluntarily given. This Court recently explained that appellate courts accord a presumption of correctness to a trial court's ruling on a motion to suppress with regard to the trial court's determination of historical facts, but "must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the ... Fifth Amendment." Connor v. State, 803 So.2d 598, 608 (Fla.2001). A review of the testimony and evidence presented at the evidentiary hearing in this case supports the trial court's finding that the statements were freely and voluntarily made.
Philmore contends that the only reason he provided statements to the police is because he believed that if he cooperated, he would avoid the death penalty. At the evidentiary hearing on this issue, Hetherington testified that he never made a quid pro quo agreement with Philmore that if Philmore cooperated with police, he would avoid the death penalty. Furthermore, Assistant State Attorney Thomas Bakkedahl testified at the evidentiary hearing that he refused to discuss pleas or charging decisions with either Philmore or Hetherington until he knew what the truth was in this case. Even Philmore conceded at the evidentiary hearing that no one gave him any promises as to the consequences of his cooperation with the police. Rather, Philmore contended that he was "led to believe" that if he cooperated, he would not face the death penalty.
This Court has held that "[s]tatements suggesting leniency are only objectionable if they establish an express quid pro quo bargain for the confession." Bruno v. State, 574 So.2d 76, 79-80 (Fla.1991). Moreover, Philmore admitted at the evidentiary hearing that Miranda warnings were administered before he gave each statement, and that he knowingly waived his Miranda rights in writing before giving each statement. Furthermore, Philmore stated that he never told the police while they were administering Miranda warnings that either Hetherington or Bakkedahl had promised him anything in exchange for his cooperation. The trial court concluded that there were no promises or threats made to Philmore in exchange for his testimony, and that Philmore provided statements to the police based upon his own free will. We agree. Therefore, because Philmore freely and knowingly waived his Fifth Amendment right to remain silent in this case, we conclude that the trial court did not err in denying Philmore's motion to suppress his statements on Fifth Amendment grounds.
As for Philmore's ineffective assistance claim under the Sixth Amendment, we decline to review this claim at the direct appeal stage. The claim is denied without prejudice to reraise the claim in a rule *929 3.850 motion. See McKinney v. State, 579 So.2d 80, 82 (Fla.1991) ("Claims of ineffective assistance of counsel are generally not reviewable on direct appeal but are more properly raised in a motion for postconviction relief."); Kelley v. State, 486 So.2d 578, 585 (Fla.1986) (same). Therefore, we deny Philmore relief on this claim.

2. Peremptory Challenge

In Philmore's second issue on appeal, he asserts that the trial court erred in granting the State's peremptory challenge regarding prospective juror Tajuana Holt, because the State's reason for excusing her was pretextual and she was in fact stricken because of her race. Only three potential jurors in this case were black. The trial court dismissed two of the three black potential jurors for cause, leaving Tajuana Holt as the sole black potential juror in this case.[14] Holt filled out a jury questionnaire, in which she made the following responses:
20. Do you have any feelings or opinions regarding the death penalty? Please explain. I feel that people shouldn't get the death penalty. Just let them stay in prison for the rest of their lives.
21. Do you think the death penalty should always be imposed in cases of murder? Please explain. Yes I do. Let them stay in prison for the rest of their lives.
During voir dire, the State claimed that Holt was "sleeping for a good portion of yesterday's jury selection." The State asked the trial court to "keep an eye on her," and the court agreed.
In response to questions during voir dire, Holt stated that she had no problem serving on a jury. She explained that although her mother was the managing clerk in the trial judge's division, her mother's job did not cause her to have any problems serving on a jury. The State asked Holt if her feelings had changed with regard to the death penalty since the time she answered the jury questionnaire, and she responded: "Well, I think they should get [the death penalty], but I think it should be other, you know, decisions too." She stated that there should be cases where death is the proper penalty, and explained that allowing defendants to stay in jail the rest of their lives as an alternative to the death penalty should be done in some, but not all, cases. Holt agreed with the State that if it established that the aggravating circumstances outweighed the mitigating circumstances, she would support the imposition of the death penalty. Holt stated that she had not heard anything about the case prior to voir dire, and that she could be a fair juror to both Philmore and the State.
The State moved to strike Holt for cause, and contended that she had slept through both days of voir dire. The trial court denied the motion, explaining that although it may have appeared that Holt was sleeping based upon the State's vantage point, Holt was in fact awake. However, the trial court noted that it did not feel that the State's reason was contrived.
The State then moved to peremptorily strike Holt. The defense asserted that the State was challenging Holt because of her race. The State claimed that its reason for excusing Holt was genuine. The State maintained that Holt's answers in her questionnaire were "quite different" than her responses during voir dire. The State also claimed that staff members of the state attorney's office spoke with Holt's mother, and Holt's mother advised them that "we would do better not to have her daughter on the jury." The defense objected *930 to this statement on hearsay grounds, and the State argued that the comment "goes to our reasons and whether our reasons are genuine." The trial court overruled the defense's objection. Finally, the State reasserted that it believed Holt was sleeping throughout voir dire.
The trial court granted the State's motion to strike Holt, explaining:
First, that the explanation given is facially race neutral.
Secondly, the Court, again, as previously stated, is aware of the sensitive nature of the case at bar and the scrutiny that will be given in this case. I am highly aware of that. But I have reviewed the questionnaire. I listened intently to the responses given by Ms. Holt, because candidly, I was concerned that that issue may arise. There is no question in my mind, given all the circumstances surrounding the strike, the explanation is not a pretense.
The Court would state again that I believe and feel strongly through the responses given by the juror, the explanation given by the State and the review of the jury questionnaire, that the basis and explanation given is genuine, and accordingly, I'm going to allow the strike on a peremptory basis.
The defense objected, and the trial court noted the objection for the record. However, the defense did not renew the objection before the jury was sworn.
We conclude that this claim has been waived because although Philmore objected at the time the State sought to exercise a peremptory strike of Holt, he failed to renew his objection prior to the jury being sworn. See Franqui v. State, 699 So.2d 1332, 1334 (Fla.1997) (holding that challenge to peremptory strike was procedurally barred because defense counsel failed to "properly renew his objection to [the juror] before accepting the jury and allowing it to be sworn"); Melbourne v. State, 679 So.2d 759, 765 (Fla.1996) (holding that defendant failed to preserve the challenge to the peremptory strike for review because she did not renew her objection before the jury was sworn); Mitchell v. State, 620 So.2d 1008, 1009 (Fla.1993) (same); Joiner v. State, 618 So.2d 174, 176 (Fla.1993) (stating that defendant abandoned his earlier objection because he failed to either renew his objection or accept jury subject to earlier objection). Moreover, we conclude that even if this claim was not procedurally barred, it has no merit because the State has advanced a facially race-neutral non-pretextual reason for peremptorily challenging Holt. Therefore, we deny Philmore relief on this claim.

3. Admission of Gruesome Photograph

In Philmore's third claim on appeal, he asserts that the trial court erred in admitting a single photograph of the victim's body after a week of decomposition that depicted a gunshot wound to her forehead because the photograph was more prejudicial than probative. Furthermore, Philmore contends that the State failed to demonstrate any real necessity in utilizing the photograph because Dr. Hobin, the medical expert who conducted the autopsy of Perron, stated that he would not be "inhibited" in his expert testimony if the photograph was cropped below the forehead.
This Court has held that "[t]he test for admissibility of photographic evidence is relevancy rather than necessity." Pope v. State, 679 So.2d 710, 713 (Fla. 1996). Where photographs are relevant, the trial court must determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] *931 them from a fair and unimpassioned consideration of the evidence." Czubak v. State, 570 So.2d 925, 928 (Fla.1990). Admission of photographic evidence of a murder victim is within the trial court's sound discretion and is subject to an abuse of discretion standard of review. See Ruiz v. State, 743 So.2d 1, 8 (Fla.1999); Gudinas v. State, 693 So.2d 953, 963 (Fla.1997). Nonetheless, this Court has "caution[ed] trial judges to scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point." Marshall v. State, 604 So.2d 799, 804 (Fla.1992); see also Almeida v. State, 748 So.2d 922, 929 (Fla.1999) (explaining that the relevancy standard "by no means constitutes a carte blanche for the admission of gruesome photos"). Where the trial court has abused its discretion in admitting photographs, this Court uses a harmless error analysis. See Almeida, 748 So.2d at 930; Duncan v. State, 619 So.2d 279, 282 (Fla. 1993); see generally State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
During the guilt phase, this Court has "upheld the admission of photographs to explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim." Larkins v. State, 655 So.2d 95, 98 (Fla. 1995) (finding that the trial court did not abuse its discretion in admitting a photograph that was relevant to aiding the medical examiner to explain the cause of death, as well as how and where the victim died). See also Pope, 679 So.2d at 713-14 (autopsy photographs were relevant to illustrate the medical examiner's testimony and the injuries he noted); Jackson v. State, 545 So.2d 260, 265 (Fla.1989) (photographs of victims' charred remains were admissible because they were relevant to prove identity and the circumstances surrounding the murders and to corroborate the medical examiner's testimony); Wilson v. State, 436 So.2d 908, 910 (Fla.1983) (nine autopsy photographs were admissible because they were relevant to show identity, the nature and extent of the victims' injuries, the manner of death, the nature and force of the violence used, and premeditation). Moreover, this Court has considered the trial court's preliminary screening as a factor weighing in favor of admissibility. See Gudinas, 693 So.2d at 963 (finding no abuse of discretion in admitting six slides of the victim's body where "the slides were preliminarily screened by the trial court, and ... were relevant and necessary to the expert's testimony").
In this case, Dr. Hobin stated during voir dire questioning that the use of the photograph would be helpful in explaining the entrance wound, the angle of the entrance wound, and what the bullet did after it entered Perron's head. Dr. Hobin explained that the photograph would be helpful because, when he describes the changes caused by the bullet, the description is very abstract to a person not familiar with this type of injury. Dr. Hobin also stated that the photograph, unlike the x-rays, would assist him in demonstratively showing what the entry wound looked like through the skin, and that "an average individual can relate in a somewhat more meaningful way with the photographic demonstration." Furthermore, Dr. Hobin testified before the jury that Perron died from a single gunshot injury, the gunshot entrance wound was located in the upper, middle part of Perron's forehead, and the wound was not a contact wound. Dr. Hobin also testified to the trajectory of the bullet and that Perron would have been immediately unconscious after the gunshot, but that she technically may have survived a little longer without perception or sensation. Moreover, the State argues that the only disputed issue in this case is premeditation, and *932 the location of the bullet hole as reflected in the photograph is relevant to demonstrate that Philmore acted in a premeditated manner in shooting the victim. Therefore, we conclude that the photograph is relevant both for showing the nature and extent of the bullet wound, and for demonstrating premeditation.
Furthermore, the trial court preliminarily screened the photograph and made specific findings concerning the photograph's relevancy and probative value. Additionally, this was the only photograph depicting the victim's body admitted into evidence. Thus, to the extent that the nature of the photograph was prejudicial, the prejudicial effect does not outweigh the photograph's probative value. Consequently, we conclude that the trial court did not abuse its discretion in admitting the photograph.

4. Guilt Phase Comments

Philmore asserts that the State made several improper arguments throughout the guilt phase proceedings. However, Philmore concedes that he failed to object to any of the State's arguments. We find Philmore's claims barred because they were not preserved for appellate review, see Fernandez v. State, 730 So.2d 277, 282 (Fla.1999), and we conclude that none of the alleged errorseither by themselves or cumulativelyrise to the level of fundamental error.

PENALTY PHASE

1. Prosecutorial Comments

Philmore contends that the State made several improper comments throughout the penalty phase proceedings. However, similar to the guilt phase comments discussed above, Philmore concedes that he did not object to any of the penalty phase comments he now alleges are improper. As with the guilt phase comments, we find Philmore's claims were not preserved for appellate review. See Fernandez, 730 So.2d at 282. Further, we conclude that none of the alleged errors-either by themselves or cumulatively-rise to the level of fundamental error.

2. Constitutionality of Florida Rule of Criminal Procedure 3.202

Philmore next asserts that the trial court erred in compelling a mental health examination of Philmore by the State's expert witness, Dr. Gregory Landrum. Specifically, Philmore argues that a compelled mental health evaluation under Florida Rule of Criminal Procedure 3.202 impermissibly requires the defendant to forego either his constitutional right to present mitigating evidence or forego his constitutional right not to be a witness against himself. Philmore contends that Dr. Landrum testified to an incident that Philmore had discussed with him regarding Philmore pulling a gun on Spann, and that this incident was improperly used by the trial court in rejecting the substantial domination statutory mitigator.
We conclude that Philmore has abandoned this issue because, although Philmore initially raised pretrial the issue of the constitutionality of rule 3.202 as it relates to compelling submission to an exam by a State expert, he never renewed the objection after the trial court denied the motion without prejudice to renew the motion at a later time. See Franqui, 699 So.2d at 1334 (finding failure to renew objection renders claim procedurally barred). Moreover, Philmore never objected to the trial court's use of Philmore's statements to Dr. Landrum as a basis for rejecting the substantial domination mitigator. Therefore, this matter is unpreserved, and we conclude that there is no error, let alone fundamental error, in allowing the State to subject the defendant *933 to a mental health examination after the defendant decides to present mitigation. See Kearse v. State, 770 So.2d 1119, 1126-27 (Fla.2000) (rejecting the contention that rule 3.202 violates a defendant's due process rights by creating a one-way discovery obligation); see also Buchanan v. Kentucky, 483 U.S. 402, 423-24, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (holding that subjecting the defendant to the State's mental health examination for the purpose of rebutting the defendant's alleged emotional disturbance did not violate the Fifth Amendment); Davis v. State, 698 So.2d 1182, 1191 (Fla.1997) (rejecting the contention that requiring a defendant to submit to an examination by the State's mental health expert before the penalty phase of a capital case violates the defendant's Fifth Amendment right against compelled self-incrimination); Dillbeck v. State, 643 So.2d 1027, 1030 (Fla.1994) (same). Therefore, we deny Philmore relief on this claim.

3. CCP

Philmore next challenges the trial court's finding of the CCP aggravator. Specifically, Philmore contends that based upon Dr. Berland's conclusion that Philmore suffered from brain damage, which manifested itself in symptoms including paranoia, depression, mania, hallucinations, and delusional paranoid thinking, he was not capable of carefully planning and prearranging the murder in this case. Furthermore, Philmore contends that Spann was responsible for the planning in this case.
Although the trial court must determine whether the State has proven each aggravating circumstance beyond a reasonable doubt, this Court's task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding. See Gore v. State, 784 So.2d 418, 431 (Fla. 2001).
This Court has recently reiterated the standard for establishing CCP:
In order to establish the CCP aggravator, the evidence must show that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.

Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted); accord Walls v. State, 641 So.2d 381 (Fla.1994). While "heightened premeditation" may be inferred from the circumstances of the killing, it also requires proof beyond a reasonable doubt of "premeditation over and above what is required for unaggravated first-degree murder." Walls, 641 So.2d at 388. The "plan to kill cannot be inferred solely from a plan to commit, or the commission of, another felony." Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992). However, CCP can be indicated by the circumstances if they point to such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course. See Bell v. State, 699 So.2d 674, 677 (Fla.1997).
Farina v. State, 801 So.2d 44, 53-54 (Fla. 2001).
In finding that CCP was established in this case, the trial court explained in its detailed sentencing order:

*934 The evidence shows a carefully planned and prearranged killing. The defendant stated to law enforcement that the day of the murder the codefendant and he discussed killing the person so they could not be identified and they would have enough time to get away with the car. In furtherance of this plan, the evidence shows that after following one vehicle without success, the two then spotted the victim's gold Lexus and followed it to a residence. In furtherance of the plan the defendant entered the vehicle at gun point and drove the victim to a remote area. The defendant then told the victim to go by the side of the canal, where he shot her execution style in the middle of her forehead. It is clear from the evidence that the defendant and his codefendant discussed killing the victim before the murder and they transported the victim to an isolated area to carry out their plan. The killing was a product of calm and cool reflection based on their plan to abduct and murder another human being. This prearranged plan continued while they hunted for a victim.
Clearly there was no pretense of moral or legal justification for this killing. The cold, calculated, and premeditated nature of it was shown by the general plan of the defendant and his codefendant. The premeditation in this case is far greater than necessary for a conviction for the crime of First Degree Murder and is of the heightened nature required for the establishment of the aggravator. This aggravating circumstance was proved beyond a reasonable doubt.
Having independently reviewed the record in this case, we conclude that the sequence of events that culminated in Perron's murder demonstrates the calm reflection and planning necessary to establish the heightened premeditation required to find CCP, and that there is no evidence of any moral or legal justification for the murder. The trial court rejected Philmore's claim that he suffered from mental illness. Yet, even if the trial court erred in this regard, this Court has held "[a] defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation." Evans v. State, 800 So.2d 182, 193 (Fla. 2001); see also Connor, 803 So.2d at 611 (upholding the trial court's finding of CCP where there was an elapse of time between kidnapping and murder allowing defendant to contemplate his actions, and defendant's mental illness was not so severe as to refute finding of CCP). As noted by the trial court in this case, Philmore, along with Spann, actively sought a car to steal in order to facilitate a bank robbery. Philmore procured the murder weapon after robbing a pawn shop on the day before the murder. Before stealing the car, Philmore and Spann discussed the fact that the car owner would have to be killed. Philmore drove with Perron for a half hour, ultimately taking her to a remote location in Martin County. Finally, Philmore shot Perron execution style in the forehead from a short distance away. Given these facts, we conclude that the trial court applied the right rule of law, and its determination is supported by competent substantial evidence in the record.

4. Avoid Arrest

Philmore contends that the trial court erred in finding that the avoid arrest aggravator was established in this case. Philmore maintains that his conduct in this case is more a result of his relationship with Spann rather than the product of his own independent decision to silence the sole witness to the carjacking.
*935 With regard to the avoid arrest aggravator, this Court has explained:
The avoid arrest/witness elimination aggravating circumstance focuses on the motivation for the crimes. Where the victim is not a police officer, "the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness," and "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender's thought processes.
In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is sufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.
Farina, 801 So.2d at 54 (citations omitted).
The trial court's sentencing order in this case cites the following facts that support the avoid arrest aggravator: Philmore stated to law enforcement that he killed the person whose car he carjacked so he could not be identified and would have enough time to get away with the car; Philmore further stated to law enforcement that once he carjacked Perron's vehicle, Philmore took Perron to a remote area, and upon exiting the vehicle, Philmore shot Perron in the forehead in an execution-style manner; and Perron's body was discovered in an isolated location.
We conclude that the trial court did not err in finding that the avoid arrest aggravator was proved beyond a reasonable doubt. First, Philmore confessed that the reason for killing Perron was witness elimination. This Court has recognized that a confession is direct evidence, and that a confession that witness elimination was the reason for the murder satisfies this aggravating circumstance. See Walls v. State, 641 So.2d 381, 390 (Fla.1994); cf. Sliney v. State, 699 So.2d 662, 671-72 (Fla.1997) (holding that confession where defendant stated that he would have to kill the victim because "[s]omebody will find out or something," was sufficient to establish avoid arrest aggravator). Second, Philmore kidnapped Perron, drove with her in her car for approximately a half hour, and took her to a remote location in Martin County. See, e.g., Preston v. State, 607 So.2d 404, 409 (Fla.1992) (acknowledging that the application of avoid arrest aggravator may apply where a victim is abducted from the scene of a crime and transported to a different location where the victim is killed); Cave v. State, 476 So.2d 180, 188 (Fla.1985) (concluding that avoid arrest aggravator was established where defendant kidnapped victim and transported her "some thirteen miles to a rural area in order to kill and thereby silence the sole witness to the robbery"). Third, there is no indication from the record that Philmore wore either a mask or gloves in order to conceal his identity. See Farina, 801 So.2d at 54. Therefore, we conclude that the trial court applied the right rule of law, and its determination is supported by competent substantial evidence.

5. Under the Influence of Extreme Mental or Emotional Disturbance

Philmore contends that the trial court erred in rejecting the statutory *936 mitigating circumstance that Philmore was under the influence of an extreme mental or emotional disturbance. A trial court has broad discretion in determining the applicability of a particular mitigating circumstance, and this Court will uphold the trial court's determination of the applicability of a mitigator when supported by competent substantial evidence. See San Martin v. State, 705 So.2d 1337, 1348-49 (Fla.1997). Moreover, with regard to the issue of expert psychological evaluations of a defendant's mental health, this Court has explained that "expert testimony alone does not require a finding of extreme mental or emotional disturbance. Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case." Knight v. State, 746 So.2d 423, 436 (Fla.1998) (quoting Foster v. State, 679 So.2d 747, 755 (Fla.1996)).
In rejecting the application of this statutory mitigator, the trial court in its sentencing order explained:
The defendant offered the testimony of Dr. Robert Berland in support of this statutory mitigator. Dr. Berland testified that he reviewed the defendant's personal records, including school records and those obtained from the Department of Corrections, as well as interviewed various family members of the defendant. He also conducted MMPI and WAIS testing. It was the testimony of Dr. Berland that the defendant suffered from a psychotic disturbance which contributed to his criminal behavior. He further testified that there may be evidence of "sequela" from a brain injury as well as posttraumatic stress disorder.
The state offered the testimony of Dr. Gregory Landrum. Dr. Landrum testified that tests utilized by Dr. Berland are outdated, which was ultimately acknowledged by Dr. Berland as it relates to the MMPI. Dr. Landrum opined that there is no credible evidence to suggest that the defendant suffered from psychosis or brain damage.
Both experts agreed that the defendant has a[sic] anti social personality disorder. The testimony being that the nature of the disorder is that the defendant has a disregard for the rights of others and it reflects criminal thinking and behavior.
It is undeniable that the defendant has experienced some difficulties in his life. The Court will address these below. The Court however simply cannot from Dr. Berland's diagnosis which was strongly rebutted on cross examination and the expert's opinion that the defendant has a personality/character disorder find that on November 14, 1997, the defendant acted under the influence of extreme mental or emotional disturbance.
The facts and circumstances of the homicide indicate a coherent and well thought out plan which spanned over the course of two days. The abduction and homicide were part of a deliberate plan. Further, there was no evidence that the defendant was under the influence of drugs or alcohol at the time of the commission of the homicide. There simply is no record evidence to suggest the defendant was under the influence of extreme mental or emotional disturbance at the time of commission of the homicide. The facts themselves belie any suggestion by Dr. Berland that the defendant acted while under extreme mental or emotional disturbance on November 14, 1997.
For the reasons stated above the Court rejects the existence of this statutory mitigating circumstance.
*937 We conclude that the trial court's rejection of this statutory mitigator is supported by competent substantial evidence. As acknowledged by the trial court in this case, although Dr. Berland testified that Philmore suffered from a chronic mental illness and was mildly to moderately psychotic, the State strongly rebutted many of Dr. Berland's conclusions on cross-examination. For example, Dr. Berland explained that the use of the Minnesota Multiphasic Personality Inventory ("MMPI") played a significant role in his overall diagnosis that Philmore was psychotic. However, on cross-examination, Dr. Berland conceded that he utilized an older version of the MMPI, which overestimated the degree of mental illness in black males by as much as 90%. Moreover, Dr. Berland admitted that none of the school records or other medical records ever diagnosed Philmore as psychotic. Although Dr. Berland explained that he used the Wechsler Adult Intelligence Scale ("WAIS") in order to determine whether Philmore suffered from brain damage, he admitted that there was controversy in the medical community over using the WAIS for purposes other than determining an individual's IQ. Further, Dr. Berland stated that Philmore had an IQ of 98, which was only two points below average.
In addition, one of the State's expert witnesses, Dr. Landrum, expressly disagreed with Dr. Berland's conclusion that Philmore suffered from any brain damage or psychosis, and stated that no statutory mitigators were established in this case. Dr. Landrum took issue with Dr. Berland's use of the WAIS to find brain damage. Dr. Landrum also explained that Philmore tested normal on the screening test for the Luria-Nebraska neuropsychological battery, which Dr. Landrum testified was a commonly recognized indicator of brain damage. Dr. Landrum stated that based on Philmore's score on the Luria-Nebraska screening test, there was a 95% chance that Philmore would show no signs of brain damage on the full battery.
Given this conflict in testimony, and the trial court's thorough consideration of this issue as reflected in the sentencing order, we reject Philmore's claim that the trial court erred in failing to find this statutory mitigator. See Rose v. State, 787 So.2d 786, 802-03 (Fla.2001) (holding that trial court did not err in rejecting mitigator that defendant was under the influence of extreme mental or emotional disturbance at time of offense where State successfully attacked the experts' findings).

6. Substantial Domination of Another

Philmore next asserts that the trial court erred in failing to find that he was acting under the substantial domination of Spann at the time of the murder. The trial court expressly rejected the application of this statutory mitigator, and explained:
The defense expert, Dr. Berland testified that through his discussion with the defendant "and a couple of lay witnesses" it was his opinion that the defendant acted under the substantial domination of the codefendant, Anthony Spann. The defendant also indicated in a statement read to the Court at the time of the sentencing hearing that he was in fear of Anthony Spann and committed the homicide because, while he was not threatened by the codefendant, he feared what he might do if he didn't do what he was told. The state expert, Dr. Landrum, testified that he found no basis for the opinion of Dr. Berland and discussed an incident that the defendant told him about in which the defendant pulled a gun on his codefendant, Anthony Spann, because he thought he had stolen some of his drugs.

*938 While the Court finds that the codefendant initiated the planning of the carjacking, abduction and murder, the defendant was clearly a willing and active participant. At all times during the course of the events, the defendant carried his own firearm, he himself carjacked and abducted the victim and he himself told the victim to exit the vehicle and shot her in the head execution style.
There was no evidence that the use of force or threats motivated the defendant to murder the victim in this case. If the Court were to accept the premise that the defendant was in fact acting under the substantial domination of his codefendant, then the inevitable conclusion would be that this was also the case when the defendant was captured on video pointing a firearm at the head of Saul Brito just ten days prior to the homicide and pulling the trigger at point blank range. While the gun apparently jammed, the video reflects the defendant's efforts to recycle the firearm again and attempt to shoot Mr. Brito at point blank range. Yet, there is absolutely no evidence of record that the codefendant, Anthony Spann, was in the store with Mr. Philmore when he attempted to murder Mr. Brito. Further, the defendant himself indicated to the Court that during the first crime with Anthony Spann he was a willing participant.
The facts of this case belie the defendant's claim that on the day of November 14, 1997, he murdered Mrs. Perron because of the substantial domination of Anthony Spann. The Court finds that the evidence in this case shows that the defendant simply made choices which were oriented to improve his own financial situation and that the defendant was not acting under extreme duress or under the substantial domination of his codefendant or any other person.
For the reasons stated above, the Court rejects the existence of this statutory mitigating circumstance.
The trial court's rejection of this statutory mitigator is supported by competent substantial evidence. Although Dr. Berland concluded that Philmore was under the substantial domination of Spann, he conceded on cross-examination that he based his conclusion on his conversations with lay witnesses, and did not utilize Philmore's recollections about the incident in determining Philmore's mental state or mental condition. Additionally, Dr. Landrum disagreed with Dr. Berland's conclusion with regard to the finding of this statutory mitigator, and related an incident told to him by Philmore in which Philmore threatened Spann with a gun after Spann stole drugs from him. Given this conflict in the expert testimony, and the fact that the trial court expressly considered all the evidence presented as reflected in its sentencing order, we deny Philmore relief on this claim. See San Martin, 705 So.2d at 1348 (upholding rejection of substantial domination mitigator where trial court found that "[t]he evidence clearly establishes that [San Martin] was an integral part of the planning and execution of these crimes"); Raleigh v. State, 705 So.2d 1324, 1330 (Fla.1997) (rejecting application of substantial domination mitigator where defendant alone murdered the victims, and defendant had an independent motive for killing one of the victims), receded from on other grounds, Delgado v. State, 776 So.2d 233 (Fla.2000); Valdes v. State, 626 So.2d 1316, 1324 (Fla. 1993) (holding that trial court's determination that substantial domination mitigator was not established was supported by competent substantial evidence where defendant participated equally in murder, defendant provided the murder weapon, and *939 defendant forced the victim out of the car, where the victim was executed).

7. Impairment of Capacity to Appreciate the Criminality of Conduct

Philmore next claims that the trial court erred in rejecting the statutory mitigator of the substantial impairment of Philmore's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In rejecting the application of this statutory mitigator, the trial court explained in its sentencing order:
The Court recognizes that this circumstance comes into play when a defendant has mental problems that limit his capacity to conform his conduct to the requirements of the law. While the Court incorporates it's discussion in relation to the first statutory mitigator discussed, it understands it is separate and distinct from this statutory mitigating circumstance.
The criminal episode from the time of the abduction of the victim to the time of her murder took approximately thirty minutes. During this time, the defendant rode with the victim and he indicated that she was crying and frightened. The defendant clearly had time to reflect on the impending homicide. He reached logical decisions on how to effect the carjacking, kidnapping, homicide and robbery. Further, he reached a calculated planned decision on how to prevent the victim from notifying the police and identifying him. His own expert opined that he could appreciate the criminality of his conduct stating that "though, he knew what he was doing was wrongthat there was some pressure on him that was not under his control that pushed him into this situation. Not that made him do it, but helped him push him into the situation." The record evidence suggests that the defendant was not using drugs on the day of the homicide, and the states' expert testified that neither the defendant's drug use or history of drug use diminished his capacity or influenced his behavior on November 14, 1997.
For the reasons stated above the Court rejects the existence of this statutory mitigating circumstance.
We conclude that the trial court's rejection of this statutory mitigator is supported by competent substantial evidence. As noted in the previous two claims, Dr. Berland's testimony was substantially refuted by the State, both through cross-examination, and through the testimony of Dr. Landrum. Therefore, we affirm the trial court's rejection of this statutory mitigator.

8. Proportionality

Finally, although Philmore has not raised proportionality as an issue before this Court, we have an independent obligation to review each death case to determine whether death is the appropriate punishment. See Morton v. State, 789 So.2d 324, 335 (Fla.2001). As this Court has stated, "The death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla. 1991). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998); Franqui, 699 So.2d at 1312. "It is not a comparison between the number of aggravating and *940 mitigating circumstances." Sexton, 775 So.2d at 935.
The jury in this case recommended the death penalty by a vote of twelve to zero. The trial court found five aggravators, no statutory mitigators, and eight relatively minor nonstatutory mitigators.[15] Concluding that the aggravating circumstances outweighed the mitigating circumstances, the trial court agreed with the jury's recommendation and imposed the death penalty.
We conclude that the death sentence in this case is proportionate when compared to other cases where the death sentence has been imposed. See Bowles v. State, 804 So.2d 1173, 1184 (Fla.2001) (affirming death sentence where evidence established five aggravatorsprevious conviction of a violent felony; murder committed during the course of a robbery and pecuniary gain (merged); CCP; and HACno statutory mitigators were found, and nonstatutory mitigators included abusive childhood and history of alcohol abuse); Looney v. State, 803 So.2d 656, 682-83 (Fla.2001) (affirming death sentence where evidence established five aggravatorsprevious conviction of a violent felony; commission during robbery and arson; pecuniary gain; commission to avoid arrest; CCP; and HAConly one statutory mitigatorregarding the defendant's age of 20 at the time of the commission of the crimes, and nonstatutory mitigators included remorse and defendant's difficult childhood); Gordon v. State, 704 So.2d 107, 110 (Fla.1997) (affirming death sentence where evidence established four aggravatorsmurder committed during the commission of a burglary and robbery; pecuniary gain; HAC; and CCPno statutory mitigators, and only minor nonstatutory mitigators); Whitton v. State, 649 So.2d 861, 864, 867 (Fla.1994) (affirming death sentence where evidence established five aggravatorsdefendant committed the crime while on parole for an earlier armed robbery conviction; prior felony conviction involving the use of force; commission to avoid arrest; pecuniary gain; and HACno statutory mitigators, and nine nonstatutory mitigators, including abuse by alcoholic parents and defendant's alcoholism); Bryan v. State, 533 So.2d 744, 748-49 (Fla.1988) (affirming death sentence where evidence established five aggravators prior felony conviction involving the use of force; murder committed during course of kidnapping and robbery; commission to avoid arrest; pecuniary gain; HAC; and CCPno statutory mitigators, and only minor nonstatutory mitigators).

CONCLUSION
Accordingly, we affirm Philmore's convictions and death sentence for first-degree murder.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Spann's trial was severed from Philmore's trial, and Spann also received the death penalty. Spann's guilt and penalty phases were conducted between Philmore's guilt and penalty phases. Philmore testified at Spann's trial.
[2] Philmore later threw the rings out the car window because Spann told him that "they will get you in a lot of trouble." The rings were never recovered.
[3] Several witnesses later identified Philmore as the robber. Philmore gave Spann a little more than half of the money, and kept the rest for himself.
[4] The police also apprehended Cooper and Stevenson. It is unclear from the record if they were charged with trespassing. However, it does appear from the record that they were not charged with any crimes related to the bank robbery or the murder.
[5] Indeed, Philmore's confession provides much of the detail of the criminal episode that led to the murder of Perron.
[6] Spencer v. State, 615 So.2d 688 (Fla.1993).
[7] Philmore read a statement at this hearing.
[8] These felonies included the battery of a corrections officer in a detention facility on August 22, 1995, a robbery in 1993, the robbery of a jewelry store and attempted murder of the jewelry store's owner on November 4, 1997, and the armed robbery of a pawn shop on November 13, 1997.
[9] In its sentencing order, the trial court explicitly considered, and rejected, the applicability of the following statutory mitigators: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the defendant acted under extreme duress or under the substantial domination of another; (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (4) defendant's age of 21 at the time of the crime.
[10] The trial court also sentenced Philmore to 15 years for Count II (conspiracy to commit robbery with a deadly weapon), life imprisonment on Counts III, IV, and V (carjacking with a deadly weapon, kidnapping, and robbery with a deadly weapon, respectively), and 5 years for Count VI (third-degree grand theft).
[11] Philmore claims that: (1) the trial court erred in failing to suppress his statements to law enforcement; (2) the trial court erred in allowing the State to exercise a peremptory challenge against prospective juror Tajuana Holt, because the State's reason for the challenge was not race-neutral; (3) the trial court erred in denying Philmore's motion to exclude a photograph depicting the deceased because the photograph was more prejudicial than probative; (4) the State made improper arguments throughout the guilt phase; (5) the State made improper arguments throughout the penalty phase; (6) the trial court erred in compelling a mental health examination of Philmore by the State's expert witness, and Florida Rule of Criminal Procedure 3.202 is unconstitutional; (7) the trial court erred in finding the CCP aggravator; (8) the trial court erred in finding the "avoid arrest" aggravator; (9) the trial court erred in rejecting the "under the influence of extreme mental or emotional disturbance" statutory mitigator; (10) the trial court erred in rejecting the "substantial domination of another" statutory mitigator; and (11) the trial court erred in rejecting the "impairment of capacity to appreciate the criminality of conduct" statutory mitigator.
[12] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[13] Philmore was charged with the bank robbery on November 15 after Sandra McGuire, who was a witness to the bank robbery, identified Philmore from a photographic lineup. However, the record is unclear whether Hetherington was appointed before or after Philmore was charged with the bank robbery.
[14] Philmore does not raise as an issue the State's cause challenges of these two jurors.
[15] In addition to rejecting the statutory mental mitigators discussed above, the trial court also rejected the defendant's age of 21 at the time of the murder as a statutory mitigating circumstance. The trial court found that Philmore acted in a mature manner and showed "criminal sophistication" in carrying out the crimes in this case. Philmore has not challenged the trial court's rejection of this statutory mitigator.