979 So.2d 372 (2008)
Edward HARRIS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D07-2160.
District Court of Appeal of Florida, Fourth District.
April 16, 2008.
*373 Carey Haughwout, Public Defender, and Peggy Natale and Ephgrat Livni, Assistant Public Defenders, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Melynda Melear, Assistant Attorney General, West Palm Beach, for appellee.
STONE, J.
Harris, age sixteen, along with four other youths, stopped a Mexican man riding a bike through their neighborhood, kicked him to death, and stole the bike and cash. He appeals his convictions for first-degree felony murder and robbery, for which he received a life sentence. We affirm.
Harris first challenges an order denying his motion to suppress a confession as not given knowingly and voluntarily. He asserts error in that: inadequate Miranda warnings were given in light of the suspect's age, experience, background, and intelligence; the method used by police officers in giving the warnings minimized the significance of the rights; the officers *374 misled him as to his true legal position with respect to the impact of admitting to a robbery resulting in homicide; and the officers conducted the interrogation without properly informing a parent. The trial court entered a fourteen page order making findings in favor of the state.
There was testimony that Harris' mother was home when the officers arrived and was told that her son was going to be taken to the police station for questioning about a recent murder in Fort Pierce. His mother did not indicate that she wanted to come to the station or that she wanted an attorney for her son. She told the officers that she knew something bad had happened on the night of the homicide. Harris was handcuffed and transported to the station.
That same day, a detective returned to Harris' house to gather some of his clothing. The mother cooperated and signed a "consent to search" form. She never said that she wanted to see her son or that she wanted him to have an attorney. Much later, Harris' mother did come to the station but the interrogation had concluded "long before" she arrived.
There was testimony that Harris was read his Miranda rights, indicated he had been arrested before and had heard his rights previously, and did not indicate that he had any trouble understanding his rights. He was calm and responsive during the interview, which was videotaped. Harris was in the tenth grade at an alternative high school for slow learners and made good grades in some subjects. He had slightly less than "C" average grades. When asked if he wanted to talk and tell his side of the story, Harris answered, "Yeah, you can hear my part of the story."
After eliciting from Harris an admission that he was at the scene of the crime, the interview continued as follows:
Q: This is your chance to give your side of the story. Okay?
A: Uh huh.
Q: For you to tell the truth about what happened.
A: Uh huh.
Q: Okay? Otherwise we're going to have to go by what other people say you did. Okay? Now, two people saying that, two so far that I talked to, saying that you were there and that you were kicking the Mexicanokay?and that you were stomping on his head like you were trying to kill him.
A: (Moves head side to side).
Q: Okay?
A: (Inaudible.)
Q: That's first degree murder. You realize that.
A: Yes, sir.
Q: That you were trying to kill him, that's what they said it looked like. But I don't think you were necessarily trying to kill him. I think you were just trying to get some money from a Mexican, and that you were going to rough him up a little bit. That happens all the time, doesn't it?
A: Yes, sir.
Q: Is that what's happening?
A: What?
Q: You were just trying to get some money
A: No, I wasn't stomping
Q: rough him up a little bit?
A: . . . I kick him a couple times, I hit him a couple times.
Q: You kicked him a couple times.
A: Yeah.
* * *
Q: . . . Now let me ask you this. It was your guys' intention just to rob him and not to stomp him.

*375 A: Yes, sir.
Q: Was that what you guys wanted to do, just to rob him?
A: Yes.
Whether a juvenile's statement was knowing and voluntary is based on the totality of the circumstances. State v. S.V., 958 So.2d 609, 611 (Fla. 4th DCA 2007); State v. Cartwright, 448 So.2d 1049, 1051 (Fla. 4th DCA 1984); Rimpel v. State, 607 So.2d 502 (Fla. 3d DCA 1992). We conclude that there was no error or abuse of discretion in denying the motion to suppress.
The relevant factors generally considered in evaluating a juvenile's statement are: (1) the methodology employed to administer the Miranda rights; (2) the age, experience, background, and intelligence of the child; (3) whether the parents were contacted and whether the child had an opportunity to speak with them prior to giving the statement; (4) whether the questioning occurred in the station house; and (5) whether the child executed a written waiver of rights. S.V., 958 So.2d at 611 (citing Ramirez v. State, 739 So.2d 568, 576 (Fla.1999)).
The law is settled that police are not required to give any particular notice to a parent before questioning a juvenile. S.V., 958 So.2d at 611 (citing Frances v. State, 857 So.2d 1002, 1003-04 (Fla. 5th DCA 2003)). Nor is there an affirmative obligation on the part of the police to extend an opportunity to a juvenile to speak with his parents prior to questioning where the juvenile does not request such opportunity. Id.
Here, at no time did Harris ever ask for his mother or an attorney to be present. The period of interrogation was brief, and Harris does not claim he was physically threatened or promised anything in return for his statement. Moreover, there is competent, substantial record evidence that Harris understood he had a right to remain silent and that the consequence for waiving that right would be the use of his statement against him at trial. He knew the detectives were investigating the death of a Mexican man and that law enforcement believed a robbery was committed in the same episode.
Just because Harris was a poor student does not mean that he did not understand his rights. Not only did sixteen-year-old Harris have prior experience with the law, but he was read his rights, and he waived them in writing. Further, there was no confusion as to whether and why he was in custody. In addition, the record contains ample testimony that Harris' mother was told that her son was being taken to the police station to be questioned about a homicide.
In Brookins v. State, 704 So.2d 576 (Fla. 1st DCA 1997), the court upheld the conviction of a sixteen-year-old murder suspect, with an IQ of 73, who voluntarily waived his rights during a police interrogation and further recognized that a confession is not involuntary simply because an officer agrees to make the defendant's cooperation known to the state and to the court.
Burch v. State, 343 So.2d 831 (Fla.1977), is also instructive. Burch was questioned for five and a half hours, the detectives accused Burch of the crime, and fabricated evidence against him. The detectives administered a fake polygraph test and then informed him that he failed it. Id. Thereafter,
[t]he detective interrogating him stated he would make the decision whether to charge appellant with first or second degree murder and that he wanted to believe appellant had not premeditatedly killed the girl. He also advised the appellant *376 to consider the difference between a capital crime and a seven-to-twenty year sentence in determining whether to confess and explain the circumstances.
Id. Subsequently, Burch confessed. Id.
The court found that Burch was fully advised of his rights, he did not ask to leave, he did not request counsel, nor did he ask to stop the interrogation. Id. at 832-33. The court concluded that Burch's statement was admissible.
Harris claims that his admissions were obtained through police trickery, and the detectives "delude[d]" him by minimizing the dangers of admitting to the assault and robbery and threatening to prosecute for first-degree premeditated murder on the basis of statements allegedly made by other defendants. Harris' knowledge of whether he would be charged with robbery or with felony murder would not have enhanced his understanding that he had a right to remain silent, nor would it have enhanced his understanding that anything he said would be used against him if he waived his rights. Indeed, Harris said he understood that anything he said could be used against him in court. See State v. Manning, 506 So.2d 1094, 1096 (Fla. 3d DCA 1987) (finding that Manning, not knowing his true situation, i.e., that he was under arrest, was "insufficient to find that his waiver was not voluntary."); id. at 1097-98 ("The use of tricks or factual misstatements in and of itself does not render a confession involuntary. There must be coercion involved, and a misstatement of fact is not coercion." (citations omitted)); State v. Moore, 530 So.2d 349, 350 (Fla. 2d DCA 1988) (concluding that misstatements and alleged suggestions of leniency made to the defendant during questioning did not invalidate the confession).
Further, the detectives did not make promises or threats that coerced Harris into confessing. Rather, they made general statements, such as, that a witness had identified Harris and that Harris faced significant jail time. They did not offer a quid pro quo bargain for a confession. See Philmore v. State, 820 So.2d 919, 928 (Fla. 2002) (finding that statements suggesting leniency in interview are objectionable only if they amount to express quid pro quo deal). Nor did the detectives indicate that murder resulting from a robbery is any less serious than intentional murder. They only inquired as to whether the boy had planned a robbery, as opposed to having grabbed the victim off the bike to intentionally beat him to death.
We also reject Harris' claim that the trial court erred in failing to appoint Harris a new attorney after conducting a Nelson[1] hearing. The record reflects that the trial court did conduct an extensive inquiry into Harris' "dissatisfaction" with his counsel. While Harris expressed dissatisfaction with counsel, he did not make an unequivocal request to discharge counsel; rather, his "request" to discharge "What if I want to get anothera different lawyer (indiscernible) counsel?"was equivocal at best. As the ambiguous question was first raised on the eve of trial, and recognizing that Harris never raised it in his multiple meetings with counsel, the trial court concluded that the question was simply a delay tactic. The only claim of incompetence mentioned on appeal is that counsel failed to investigate alibi witnesses. However, when the court inquired about this, it learned that in several meetings with counsel, Harris never mentioned witnesses placing him somewhere else at the time of the crime, or claimed that his confession was not true. Hence, the complaint *377 boils down to problems with communication.
As this court recently reiterated, "`[j]udges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay.'" Tyler v. State, 945 So.2d 662 (Fla. 4th DCA 2007) (quoting Foster v. State, 704 So.2d 169, 173 (Fla. 4th DCA 1997)). In any event, the trial court gave Harris time to confer with counsel about a possible alibi defense. In addition, Harris said on the record that he understood and agreed with counsel's decision not to call any witnesses or put on any defense before the jury.
As to all other issues raised, we also find no reversible error or abuse of discretion.
WARNER and GROSS, JJ., concur.
NOTES
[1] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).