965 So.2d 1 (2007)
Johnny HOSKINS, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-28.
Supreme Court of Florida.
April 19, 2007.
Rehearing Denied August 8, 2007.
*5 James S. Purdy, Public Defender and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Johnny Hoskins appeals a circuit court judgment imposing a sentence of death upon resentencing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm.

I. THE FACTS AND PROCEDURAL HISTORY
The facts supporting Hoskins's convictions are detailed in our decision on his direct appeal of his convictions and previous death sentence. Hoskins v. State, 702 So.2d 202, 203-04 (Fla.1997). We briefly summarize them. On Sunday, October 18, 1992, police went to eighty-year-old Dorothy Berger's home after neighbors discovered that her door was open but no one was home. The television and air-conditioning were on; a small amount of blood, a bent pair of eyeglasses, and a green hand towel were on the bed; several items in the room appeared to be out of place; a shoe impression was visible in the dust on the floor; and Berger's car was gone. There was no sign of forced entry. The victim had last been heard from around 6:30 p.m. the previous evening.
Hoskins lived with his girlfriend next door to the victim. On the evening of October 17, a witness saw him driving a car similar to the victim's. At about 5 a.m. the next morning, Hoskins arrived at his parents' house in Georgia driving that same car. After he arrived, he borrowed a shovel and left. He returned about twenty minutes later. On Monday, October 19, he was stopped in Georgia for a traffic violation. Police later determined that the car he was driving belonged to the victim. Police found vegetation and blood in the trunk of the car. Thereafter, Hoskins's father led police to an area near his home where the type of vegetation found in the trunk grew. The victim was discovered there in a grave with her hands tied behind her back and a gag in her mouth.
Further examination revealed that the victim had been raped; had numerous injuries to her body; had several blows to her head, one of which likely caused her to become unconscious; and had died of strangulation, which occurred after the sexual battery and beating. DNA analysis revealed that the semen found on the victim and on the victim's bed sheet could have come from Hoskins.
The jury convicted Hoskins of first-degree murder, burglary of a dwelling, sexual battery with physical force, kidnapping, and robbery, and the circuit court sentenced him to death for the first-degree murder. Hoskins, 702 So.2d at 203. The trial court set aside the original penalty phase proceeding. Id. at 204. Before the second proceeding, at the suggestion of defendant's mental health expert (Dr. Krop), the defense requested neurological testing to develop mitigating mental health evidence. The trial judge denied the request. Id. In the second penalty phase proceeding, the jury unanimously recommended, and the trial judge imposed, a death sentence. Id. On appeal, we affirmed Hoskins's convictions and the sentences, except the death sentence.[1] As to *6 the death sentence, we remanded for a PET scan and subsequent evidentiary hearing to determine whether the PET scan showed an abnormality and, if so, whether the results caused Dr. Krop to change his testimony. Id. at 210-11. The trial judge concluded that the PET scan showed an abnormality and that (as conceded by the State) Dr. Krop's testimony changed as a result. Hoskins v. State, 735 So.2d 1281, 1281 (Fla.1999). The trial court did not reach the validity of the PET scan or conduct a hearing pursuant to Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923) (requiring new or novel scientific principles to "have gained general acceptance in the particular field in which it belongs"). 735 So.2d at 1281 n. 1. Based on the trial court's findings, we vacated the death sentence and remanded for a new penalty phase proceeding, with the validity of the PET scan and Frye issues to be considered as part of the new sentencing proceeding. Id. The trial court held a Frye hearing and overruled the State's objection to the admissibility of the PET scan evidence.
Following the new penalty phase proceeding, the jury recommended death by a vote of 11-1. By special interrogatories, the jury found three aggravating circumstances: (1) the capital felony was committed during the course of or in flight after committing the crimes of robbery, sexual battery, or kidnapping (vote of 12-0); (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (vote of 12-0); and (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (vote of 10-2). The trial court found the same aggravating circumstances had been proven beyond a reasonable doubt.
The trial court found the following mitigating circumstances: (1) the Defendant formed and maintained loving relationships with his family (little weight); (2) the Defendant was a father figure to his siblings (little weight); (3) the Defendant protected his mother from his father's abuse (little weight); (4) low IQ (little weight); (5) low mental functional ability (little weight); (6) some abnormalities in the brain which may cause some impairment (little weight); (7) an impoverished and abusive background (some weight); (8) mental age equivalent (between fifteen and twenty-five) (little weight); (9) the Defendant helped support his family financially (little weight); (10) the Defendant had and cared for many pets (little weight); (11) no disciplinary problems in school (little weight); (12) the Defendant suffered from poor academic performance and left school at age sixteen to work to help his family (little weight); (13) the Defendant was not malingering (little weight); (14) the Defendant expressed remorse (little weight); (15) potential for rehabilitation and lack of future dangerousness (little weight); and (16) good jail conduct, including death row behavior (little weight).[2] The trial court concluded *7 that any one of the aggravating circumstances standing alone far outweighed all of the mitigating circumstances and resentenced Hoskins to death.

II. ISSUES ON APPEAL
Hoskins raises six claims: (1) the trial court erred in overruling his objection to the State's use of a peremptory challenge to an African-American juror; (2) the trial court erred in limiting Hoskins's voir dire examination regarding the potential jurors' ability to consider "gory photographs" which were already in evidence; (3) the trial court erred in failing to give the requested limiting instruction on victim impact evidence at the time of introduction; (4) the trial court erred in denying Hoskins's requested jury instructions; (5) the trial court included improper aggravating circumstances, excluded existing mitigating circumstances, and failed to properly find that the mitigating circumstances outweighed the aggravating circumstances; and (6) Florida's capital sentencing process is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The State cross-appealed, asserting the trial court improperly admitted PET scan evidence. Below we address each of Hoskins's claims and the proportionality of Hoskins's death sentence. Because we affirm, we do not address the State's cross-appeal.

A. Peremptory Challenge
Hoskins claims the trial court erred in permitting the State's peremptory challenge of an African-American juror (Ms. Harp) because: (1) the record does not support the prosecutor's and trial court's interpretation of Ms. Harp's voir dire responses; (2) the State accepted similarly situated jurors; (3) the State's questioning "singled out" Ms. Harp; and (4) the trial court erred in focusing on the "reasonableness" of the State's reason rather than its "genuineness."
As we stated in Melbourne v. State, 679 So.2d 759, 764 (Fla.1996):
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not pretext, the strike will be sustained (step 3).
(Footnotes omitted.) Peremptory challenges "are presumed to be exercised in a nondiscriminatory manner." Jones v. State, 923 So.2d 486, 490 (Fla.2006) (quoting Melbourne, 679 So.2d at 764). "[T]he appropriate standard for appellate review for determining the threshold question of whether there is a likelihood of racial discrimination in the use of peremptory challenges is the abuse of discretion standard." Files v. State, 613 So.2d 1301, 1304 (Fla. 1992). The trial court's decision turns on an assessment of credibility and will be affirmed unless clearly erroneous. Jones, 923 So.2d at 490. Below, we detail the circumstances surrounding the strike, address each of Hoskins's arguments, and *8 conclude that Hoskins has failed to establish that the trial court's decision was clearly erroneous.
The parties conducted jury selection over two days. Each day, the State asked potential jurors about prior contact with law enforcement and whether they, members of their families, or their friends had prior criminal arrests or investigations. Ms. Harp responded, "I have several people in my family, friends, that ha[ve] been arrested. My godson right now is serving time in prison . . . with several counts of felonies." Upon further inquiry she indicated that her godson's felonies were violent.
Following voir dire on the second day, the State moved to strike Ms. Harp, and the defense objected:
MR. CHANG [defense counsel]: Judge, we would object and ask the State to show a race-neutral reason. Let the record reflect she's the only African-American person on the venire.
THE COURT: Well, she certainly is an African-American, and whether she's the only one or not, I'm not sure. But I'll still find that she is a member of a group and sufficient predicate has been laid for the challenge.[3]
What's your reason here, Mr. Brown?
MR. BROWN [prosecutor]: Judge, the reason on Miss Harp, she indicated her godson, who she indicated some bit of closeness, serving a long-term prison sentence, it was for a violent felony. She also indicated a number of other family members and friends who had been convicted, have been to prison.
The defense pointed to jurors Mayhue, Ingraham, Wilborn, Nopper, Loftis, and Campione as similarly situated to Ms. Harp, but acceptable to the State. The trial court asked the court reporter to read back the pertinent portion of Ms. Harp's questioning and, following argument of counsel, ruled:
THE COURT: Well, certainly the proffered reasons are neutral and reasonable. I don't think that somebody else has got somebody else somewhere who's been arrested or another family member or friend that's been convicted of a crime and therefore this is not neutral and not reasonable, I think you've got to look at the overall picture.
Certainly the answers given by Mrs. Harp support the reasons proffered for the neutrality of the challenge, and you know, I justI can't find that the reasons given are pretextual; they're not, they're real. And if there's to be anything left of peremptory challenges, and I believe there is, that once the Court determines that the reasons proffered are both neutral and reasonable, which I've determined, and that the answers given in Voir Dire support those reasons, which they do, the Court Reporter has just read it back and confirmed it, and once the Court finds that the reasons are not pretextual as an excuse to excuse the juror for racial reasons, I think it's appropriate that the challenge be allowed and that the objection to the challenge be overruled.
Had that same challenge been made to any other member of the venire who testified identically to Ms. Harp, without regard to black or white or Hispanic or any other kind of group, male, female, whatever, old, young, it would have *9 passed muster with absolutely no problem; I don't see why it should be any different here.
The challenge will be allowed.
The defense then exercised another peremptory challenge and the parties reached an agreement regarding the panel. Following announcement of the final panel, the defense indicated, "The panel's acceptable," the parties selected alternate jurors, and Mr. Hoskins himself accepted the jury.[4]

1. "Misinterpretation" of Voir Dire Responses
Hoskins asserts that the State's reason is not genuine because the record does not support the prosecutor's and trial court's interpretations of Ms. Harp's voir dire responses. Specifically, in response to the trial court's request to provide a reason for the strike, the prosecutor stated that Ms. Harp had a godson serving a "long-term prison sentence" and had "a number of other family members and friends who had been convicted, have been to prison." (Emphasis added.) Hoskins argues that the record does not support this claim because Ms. Harp actually stated that several family members and friends had been arrested and the State did not ask the length of her godson's prison sentence. We reject this argument. While the trial judge initially confused Ms. Harp's voir dire responses with those of another juror, counsel corrected him, and the trial judge asked the court reporter to read back Ms. Harp's questioning. Thus, to the extent the prosecutor misstated Ms. Harp's responses, the misstatement was corrected when the responses were read back verbatim. In addition, other than correcting the initial confusion regarding the testimony, the defense did not question the facts on which the strike was based, but argued only that other jurors also had convictions or contacts with the law. Therefore, the issue was not preserved. See, e.g., Rimmer v. State, 825 So.2d 304, 321 (Fla.2002) ("The trial court . . . cannot be faulted for accepting the facial reason offered by the State, especially where the State's factual assertion went unchallenged by the defense."); Fotopoulos v. State, 608 So.2d 784, 788 (Fla.1992) ("[The] claim that this reason is not supported by the record was not raised below and therefore has been waived."); Floyd v. State, 569 So.2d 1225, 1229 (Fla.1990) ("[W]hen the state asserts a fact as existing in the record, the trial court cannot be faulted for assuming it is so when defense counsel is silent and the assertion remains unchallenged.").

2. Other Venirepersons Were Not "Similarly Situated"
The State's concern with Ms. Harp was that she had a number of family members and friends who had been arrested, in addition to a godson currently in prison on a violent felony conviction. "The fact that a juror has a relative who has been charged with a crime is a race-neutral reason for excusing that juror." Fotopoulos, 608 So.2d at 788. Hoskins asserts that the proffered reason is discriminatory because other prospective jurors also had family and friends who had been arrested or had been arrested themselves. Certainly, a challenge based on reasons equally applicable to an unchallenged juror can indicate pretext. See Melbourne, 679 So.2d 764 n. 8. However, the trial court is in the best position to assess the genuineness of the reason advanced, and the decision *10 will be affirmed unless clearly erroneous. See Jones, 923 So.2d at 490.
At trial, the defense identified jurors Mayhue, Ingraham, Wilborn, Nopper, Loftis, and Campione as similarly situated to Ms. Harp. Of these, the State challenged Mr. Wilborn for cause based on his prior experiences with law enforcement and problems with the death penalty. The defense peremptorily challenged Mr. Ingraham. The others served on the jury. Mr. Mayhue's sister-in-law had been arrested for shoplifting. Mr. Ingraham counseled a church member convicted and serving twelve years for child molestation. Mr. Wilborn had a DUI and other traffic violations. Mr. Nopper's nephew had been arrested for domestic violence, but no charges were pressed. Ms. Loftis's son had been arrested for a traffic violation in college. Finally, Mr. Campione had a friend convicted of a felony in Arkansas several years before. None of these jurors have the combination of a number of family members or friends who have been arrested and a close family member or friend with a violent felony conviction.
We have upheld peremptory challenges against charges of discrimination in similar circumstances. In Files, 613 So.2d at 1302, the defendant argued that the State's reason for striking an African-American jurorthat she was divorced, had five children, and was unemployedwas pretextual where the State did not also strike divorced or unemployed white jurors. In upholding the challenge, we recognized that "we must rely on the superior vantage point of the trial judge, who is present, can consider the demeanor of those involved, and can get a feel for what is going on in the jury selection process." Id. at 1305. We found two divorced and employed jurors and a third married unemployed juror dissimilar from an unemployed, divorced mother of five. Id.; see also Smith v. State, 799 So.2d 421, 425 (Fla. 5th DCA 2001) (holding that the reasons for a strike were not "equally applicable" where the juror challenged had one cousin recently prosecuted and another in federal prison and the "similarly situated" juror had a son whose juvenile charge was dropped prior to prosecution); Henderson v. State, 810 So.2d 1065, 1066 (Fla. 4th DCA 2002) (finding a juror with a spouse currently serving time in federal prison on drug charges dissimilar from a juror whose son had been charged and tried for a DUI offense). Similarly, here, the potential jurors Hoskins identified at trial are not similarly situated to Ms. Harp. None identified more than one person (themselves, a friend, or family member) with prior arrests. None identified a person with whom they are close currently incarcerated for a violent felony conviction. It is the number of family members or friends that have been arrested along with the nature of her godson's conviction that distinguishes Ms. Harp from the other jurors.
On appeal, Hoskins argues that potential jurors Shoeman, Campione, Cottrill, Ingraham, Salley, and Sauro were also situated similarly to Ms. Harp. However, at trial Hoskins did not mention jurors Shoeman, Cottrill, Salley or Sauro. Therefore, his claim is waived as to these jurors. See, e.g., Davis v. State, 691 So.2d 1180, 1181 (Fla. 3d DCA 1997) (noting that the similarly situated juror argument "was not made to the trial judge and was consequently waived for purposes of appellate review"). In addition, while it is clear from the record that Ms. Harp is African-American (and it is at least implied that the jurors identified as similarly situated at trial are not African-American), the races of jurors Shoeman, Cottrill, Salley and Sauro are not identified in the record. Therefore, even if the claim is not waived, it is impossible to determine the question of pretext as it relates to these jurors. *11 See id. at 1182 (noting that the failure to identify race of a venireperson makes it "impossible . . . to determine the question of pretext"); cf. Rodriguez v. State, 753 So.2d 29, 40 (Fla.2000) ("[W]e cannot determine the absence of pretext where the similarly situated venireperson used . . . to support his argument [that the defense challenge was not pretextual] was never identified as Hispanic.") Thus, because the peremptory is presumed to be nondiscriminatory, Hoskins has failed to demonstrate pretext. See Melbourne, 679 So.2d at 764.

3. The State's Questioning Did Not "Single Out" Ms. Harp
Hoskins argues the State singled out Ms. Harp because it did not ask the other jurors about the nature of the crimes committed, but specifically asked Ms. Harp whether any of the felony arrests of her family members and friends were for violent felonies. Hoskins did not raise this argument below. See, e.g., Austin v. State, 679 So.2d 1197, 1199 (Fla. 3d DCA 1996) (finding no error in the exercise of the peremptory challenge but noting that the defendants failed to preserve additional pretext arguments by failing to raise them below). Even on the merits, although singling out a juror for special treatment can indicate pretext, see Melbourne, 679 So.2d at 764 n. 8, the record does not support Hoskins's claim.
The State asked each venireperson about prior contact with law enforcement and whether they, members of their families, or their friends had prior criminal arrests or investigations. For the vast majority of the panel who responded affirmatively, it was unnecessary to inquire further because the nature of the crime was implied in the response. For others, like Ms. Harp, the State did inquire as to the circumstances of the arrest. For example, the State asked Mr. Shoeman about the result of his brother's arrest, and Mr. Salley about the nature of the crime committed by his nephew. Although the State did not inquire about the nature of the crime committed by Mr. Campione's friend, Ms. Wirkus's nephew, Ms. Cottrill's son, or Ms. Sauro's brother, it peremptorily challenged Ms. Wirkus and challenged for cause Ms. Cottrill. Ms. Sauro had previously indicated that her husband was a deputy for the Brevard County Sheriff's Office. Thus, the State likely found Ms. Sauro acceptable on that basis, regardless of any negative law enforcement contacts her brother may have had. Finally, the State did not inquire as to the nature of the felony committed by Mr. Campione's friend several years before in Arkansas. However, the State could have concluded that, unlike Ms. Harp's godson currently serving time for "several counts" of felonies, the nature of Mr. Campione's friend's felony conviction several years before was unimportant. Again, the trial court is in the best position to evaluate what is going on in the jury selection process. Files, 613 So.2d at 1305.
In addition, the State peremptorily struck Ms. Wunsch, who indicated that her brothers had been arrested for "various things"; Ms. Wirkus, who indicated that her nephew had been arrested and served some jail time; Mr. Kerwood, who had been arrested after being stopped for a seatbelt violation in his brother's car; and Mr. Hammons, who did not indicate prior arrests on his juror questionnaire or during voir dire, but upon further questioning admitted to two prior DUI arrests. The fact that the State also struck other potential jurors who responded affirmatively about arrests further indicates it did not single out Ms. Harp. See Smith, 799 So.2d at 425 (stating that the State did not single out a juror where it struck other jurors for similar reasons). In sum, we find that the *12 record does not support Hoskins's claim that the State singled out Ms. Harp.

4. The Trial Court Applied the Correct Standard
Hoskins vaguely argues that the trial court employed an incorrect standard because it focused on the reasonableness of the proffered reason rather than its genuineness. Indeed, we have specified that "[t]he court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness." Melbourne, 679 So.2d at 764. However, reasonableness is one factor that the court can consider in assessing genuineness. Id. at 764 n. 9. Here, the trial court did just that in finding the reason given "reasonable" and non-pretextual. In addition, while the trial court did not use the word "genuine," the trial court did find the reason "real." These words are synonymous. There is no requirement that the trial court specifically use the word "genuine." See, e.g., Bowden v. State, 787 So.2d 185, 188 (Fla. 1st DCA 2001) ("There are no specific words that the trial court must state to satisfy the step 3 considerations of Melbourne."). Accordingly, we reject Hoskins's claim.

B. Use of Autopsy Photograph During Voir Dire
Hoskins next argues that the trial court abused its discretion in denying his request to show the potential jurors an autopsy photograph of the victim during voir dire. Defense counsel sought to show potential jurors the photograph and ask whether it would cause them to vote for the death penalty. The trial court denied the request, but indicated that the defense could "tell the Jury that they're going to hear and see probably some pretty graphic testimony and photographs of injuries, including photographs taken during the autopsy." The defense did inform the jurors that they would see "very graphic photos" and "gory, graphic images" of the victim, and questioned some of the jurors regarding their ability to remain impartial and fair despite viewing the photographs.
No Florida court has addressed whether the defense must be permitted to show potential jurors graphic autopsy photographs during voir dire. Hoskins has cited no cases, and we are not aware of any, holding to that effect. Instead, courts have found no abuse of discretion in preventing the use of such photographs. See State v. Thibodeaux, 728 So.2d 416, 422 (La.Ct.App.1998) (holding that the trial court did not abuse its discretion in preventing the use of photographs of the victims during voir dire); State v. Bibb, 626 So.2d 913, 942 (La.Ct.App.1993) (recognizing that the "purpose of voir dire examination is not to elicit jurors' opinions concerning particular evidence," and holding that the trial court did not abuse its discretion in refusing to permit the defense to show potential jurors gruesome photographs of the defendant's slain children); cf. State v. Proctor, 585 N.W.2d 841, 844-45 (Iowa 1998) (holding the trial court did not abuse its discretion in restricting defense counsel's display of gruesome crime scene photographs from another murder case); Commonwealth v. Keohane, 444 Mass. 563, 829 N.E.2d 1125, 1133 (2005) (holding the trial judge did not abuse his discretion in refusing to display two autopsy photographs to the venire where the trial judge explained that there would be graphic photographs and asked prospective jurors whether they could remain fair and impartial); Bennett v. Commonwealth, 236 Va. 448, 374 S.E.2d 303, 317 (1988) (holding the trial court did not err in refusing to permit use of photographs of the victim during voir dire where the photographs had not been admitted into evidence and the trial court permitted an oral description of the murder scene).
*13 Here, defense counsel, in effect, sought an advance opinion of the evidence from the jurors. The purpose of voir dire is to "obtain a fair and impartial jury, whose minds are free of all interest, bias, or prejudice," not to shock potential jurors or to obtain a preview of their opinions of the evidence. Ferreiro v. State, 936 So.2d 1140, 1142 (Fla. 3d DCA 2006) (quoting Pope v. State, 84 Fla. 428, 94 So. 865, 869 (1922)). "The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." Vining v. State, 637 So.2d 921, 926 (Fla. 1994). While the trial court did not permit the use of the actual photographs, it did permit questioning about the effect of viewing graphic autopsy photographs. Therefore, the record does not demonstrate that the trial court restricted Hoskins's ability to determine the jurors' fairness. See Ferreiro, 936 So.2d at 1142 (holding that the trial court did not abuse its discretion or restrict counsel's ability to determine the fairness of jurors where it refused to permit defense counsel to question potential jurors in a manner that referred to the facts of the case); King v. State, 790 So.2d 1253, 1255 (Fla. 5th DCA 2001) (holding that the trial court did not abuse its discretion in preventing defense counsel from questioning prospective jurors on the effect of viewing graphic autopsy photographs where the State already had questioned prospective jurors about the effect of the photographs). Accordingly, the trial court did not abuse its discretion in preventing use of autopsy photographs during voir dire.

C. Victim Impact Limiting Instruction
In his third claim, Hoskins argues that the trial court abused its discretion in failing to give a limiting instruction when admitting victim impact evidence. Such evidence, "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death," is admissible once the prosecution has provided evidence of one or more aggravating circumstances. § 921.141(7), Fla. Stat. (2004). Just before resting its case, the State called the victim's niece to read a short statement (less than two pages in the transcript). The defense requested that the jury be given a limiting instruction both before and after it heard the victim impact evidence. The trial court asked, "Is there some authority . . . for giving [the instruction] now?" Defense counsel responded in the negative, and the trial court denied the request.
At the conclusion of all evidence, the trial court instructed the jury that the victim impact evidence "may be considered by you to determine the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death," but that "the law does not allow you to weigh this evidence as an aggravating circumstance." We have consistently approved similar instructions. See, e.g., Rimmer, 825 So.2d at 330-31 (approving an instruction that victim impact evidence "should not be considered by you as evidence of an aggravating circumstance or rebuttal of mitigating circumstances," but "may be considered to demonstrate the victim[']s uniqueness as an individual human being and the resultant loss to the community's members by the victim[']s death"); Alston v. State, 723 So.2d 148, 160 (Fla.1998) (approving an instruction that "you shall not consider the victim impact evidence as an aggravating circumstance, but the victim impact evidence may be considered by you in making your decision in this matter").
Hoskins does not quarrel with the wording of the instruction or the content of *14 the statement. Instead, he argues that under section 90.107, Florida Statutes (2004), the court should have given a limiting instruction before the statement was given. That rule of evidence provides that "[w]hen evidence that is admissible as to one party or for one purpose, but inadmissible as to another party or for another purpose, is admitted, the court, upon request, shall restrict such evidence to its proper scope and so inform the jury at the time it is admitted." § 90.107, Fla. Stat. (2004). Hoskins failed to preserve this argument. Upon inquiry, defense counsel told the trial court he did not have authority for giving the victim impact limiting instruction at the time of introduction. "For an issue to be preserved for appeal, . . . it `must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'" Perez v. State, 919 So.2d 347, 359 (Fla.2005) (quoting Archer v. State, 613 So.2d 446, 448 (Fla. 1993)) (emphasis added), cert. denied, ___ U.S. ___, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006); see also Rimmer, 825 So.2d at 330. In Rimmer, the defendant argued on appeal that the victim impact instruction did not provide the jury with clear instructions on how to consider the evidence. 825 So.2d at 330. While defense counsel objected to introduction of several statements and presented alternative instructions, he did not raise the argument made on appeal with the trial court. Id. We held that "because appellant raises on appeal an argument that is different than the one argued to the trial court, appellant's claim is not preserved for appellate review." Id. at 330. Similarly, here, defense counsel did not raise section 90.107 in the trial court. Therefore, the claim is not preserved.
In any event, given that the trial court ultimately instructed the jury properly, the minimal amount of victim impact evidence presented, and the strong case for aggravation and relatively weak case for mitigation, any error would be harmless beyond a reasonable doubt. See, e.g., Alston, 723 So.2d at 160 (finding harmless any error in admitting victim impact testimony from victim's mother "given the strong case in aggravation and the relatively weak case for mitigation"); Varnadore v. State, 626 So.2d 1386, 1386 (Fla. 5th DCA 1993) (holding error in failing to give a limiting instruction at the time of admission of evidence of a prior conviction harmless where standard instructions were given at the close of the evidence and defense counsel told the jury during closing that the prior felonies could only be considered in relation to the weight of the defendant's testimony).

D. Requested Jury Instructions
Hoskins next argues that the trial court erred in denying modifications to the standard jury instructions related to: (1) consideration of aggravating factors; (2) HAC; (3) mitigation; and (4) resentencing. We review the denial of a requested instruction for an abuse of discretion. See James v. State, 695 So.2d 1229, 1236 (Fla. 1997) ("[A] trial court has wide discretion in instructing the jury, and the court's decision . . . is reviewed with a presumption of correctness on appeal.").

1. Aggravating Factors
The standard instruction on aggravating factors reads in part: "The aggravating circumstances that you may consider are limited to any of the following that are established by the evidence." Hoskins requested that the instruction be modified to read: "The aggravating circumstances that you may consider are limited *15 to any of the following that you find are established by the evidence." He also requested that the standard instruction, "If you find the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five years,"[5] be modified to read, "If the aggravating circumstances you find do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five years even in the absence of mitigation evidence." See Fla. Std. Jury Instr. 7.11 (2004). The trial court denied the requests. Hoskins argues that the standard instructions impermissibly shift the burden of proof to the defendant. He also vaguely argues that the standard instructions "comment on the evidence" because they give the impression that the listed aggravating factors already have been established.
We have held that the standard instructions do not improperly shift the burden of proof and therefore reject this argument. See, e.g., Miller v. State, 926 So.2d 1243, 1257 (Fla.2006). We also fail to see how the standard instructions improperly comment on the evidence. In addition to the above-quoted instructions, the trial court instructed the jury (also in accord with the standard instructions) that "[e]ach aggravating circumstance must be established beyond a reasonable doubt before it may be considered by you in arriving at your decision." Thus, the instructions made clear that the aggravators had not already been established but, instead, had to be proven beyond a reasonable doubt before being considered. The trial court did not abuse its discretion in instructing the jury in accord with the standard instructions.

2. The HAC Instruction
With regard to HAC, the defense requested that the judge instruct the jury on several points: that the term "unnecessarily torturous" be defined to include an intent element; that "[t]he fact that it might have taken a matter of minutes to die once the process of the homicidal assault began cannot, by itself, support a finding of this aggravating circumstance"; and that "premeditation does not make a killing `especially heinous, atrocious, or cruel.'" The trial court denied the requests, but granted the defense's requested additional instruction that "the actions of the defendant which were taken after the victim was dead or rendered unconscious from which she never regained consciousness should not be considered in determining whether the murder was especially heinous, atrocious, or cruel." With this addition, the court instructed the jury in accord with the standard instructions.
The trial court did not abuse its discretion in denying the requests. First, HAC does not have an intent element. See, e.g., Buzia v. State, 926 So.2d 1203, 1211 (Fla.) ("The intention of the killer to inflict pain . . . is not a necessary element of the aggravator.") (quoting Francis v. State, 808 So.2d 110, 135 (Fla.2001)), cert. denied, ___ U.S. ___, 127 S.Ct. 184, 166 L.Ed.2d 129 (2006); Bowles v. State, 804 So.2d 1173, 1177 (Fla.2001) (rejecting a claim that the trial court erred in refusing *16 a proposed HAC instruction that included an intent element). Further, in Hall v. State, 614 So.2d 473, 478 (Fla.1993), we approved an instruction mirroring the one given in this case. Thus, we reject this claim.

3. Mitigation
The trial court denied several defense requested instructions regarding mitigators: one noting that mitigators do not need to be found unanimously; one explaining the definition of mitigating evidence; and one clarifying how jurors should consider mental impairment in mitigation. Instead, the trial court used the standard jury instructions. We have repeatedly held that where the standard instructions are followed, "clarifying instructions regarding mitigating circumstances are not required." Darling v. State, 808 So.2d 145, 163 (Fla.2002); see also Miller, 926 So.2d at 1257 ("[T]his Court has rejected the claim that the standard mitigation instructions fail to define mitigation adequately."). We reject this claim as well.

4. Resentencing
The defense requested that the standard instruction on resentencing be modified to avoid telling the jury the procedural status of the case. The trial court denied the request and instructed the jury in accord with the standard instruction. In Kearse v. State, 770 So.2d 1119, 1130 (Fla.2000), we recognized that the standard instruction on resentencing should be given and "[n]o other instruction is to be given by the court as to a prior jury's penalty-phase verdict or why the case is before the jury for resentencing at this time." Therefore, the trial court did not abuse its discretion in refusing the requested instruction.

E. Consideration of Aggravating and Mitigating Circumstances
Hoskins next claims that the trial court erred in considering aggravating and mitigating circumstances. This claim consists of several subclaims, which we address below: (1) the trial court erred in rejecting the statutory mental mitigators; (2) the trial court erred in assigning weight to mitigators and concluding the aggravators outweighed the mitigators; (3) the trial court erred in instructing the jury on and finding the killing to avoid arrest aggravator; and (4) the trial court erred in finding HAC. We reject all these claims.

1. Statutory Mental Mitigators
Hoskins asserts that the trial court erred in rejecting two statutory mental mitigators: that "the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," § 921.141(6)(b), Fla. Stat. (2004); and that "the capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired." § 921.141(6)(f), Fla. Stat. (2004). As we have previously stated:
Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved if the record contains substantial evidence to support the trial court's rejection of the mitigating circumstance.
Nelson v. State, 850 So.2d 514, 529 (Fla. 2003) (quoting Spencer v. State, 645 So.2d 377, 385 (Fla.1994)). With respect to expert psychological evaluations, we have explained that "expert testimony alone does not require a finding of extreme mental or emotional disturbance. Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case." *17 Philmore v. State, 820 So.2d 919, 936 (Fla. 2002) (quoting Knight v. State, 746 So.2d 423, 436 (Fla.1998)). "A trial court has broad discretion in determining the applicability of a particular mitigating circumstance, and this Court will uphold the trial court's determination of the applicability of a mitigator when supported by competent substantial evidence." Id.; see also Foster v. State, 679 So.2d 747, 755 (Fla.1996) ("As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion."). As we explain below, the sentencing order reflects that the trial court considered all of the evidence presented, and the rejection of the statutory mental mitigators is supported by competent, substantial evidence.

(a) The "Extreme Mental or Emotional Disturbance" Mitigator
In rejecting the "under the influence of extreme mental or emotional disturbance" mitigator, the trial court summarized the evidence presented, including substantial expert testimony, and found that (1) Hoskins has a hypofrontal lobe abnormality that can result in reduced ability to control impulsive behavior; (2) it is not a mental or emotional disturbance, much less an extreme mental or emotional disturbance; and (3) even if considered an extreme mental or emotional disturbance, the testimony is clear that Hoskins was not under its influence at the time of the murder. The evidence supports the trial court's findings. The defense's own expert (Dr. Krop) testified that, while the frontal lobe impairment could explain the rape, there was no connection between the frontal lobe impairment and Hoskins's subsequent actions. None of the experts testified that Hoskins was under the influence of any mental or emotional disturbance at the time of the murder.
This case is similar to Philmore, 820 So.2d at 936. There, a defense expert testified that the defendant suffered from a psychotic disturbance as well as a possible brain injury and posttraumatic stress disorder. Id. The State's expert found no credible evidence that the defendant suffered from psychosis or brain damage, but agreed that the defendant suffered from an antisocial personality disorder. Id. After considering the testimony, the trial court concluded that "[t]he facts and circumstances of the homicide indicate a coherent and well thought out plan. . . . There simply is no record evidence to suggest the defendant was under the influence of extreme mental or emotional disturbance at the time of commission of the homicide." Id. We upheld the rejection of the mental mitigator. Id. at 937; see also Walls v. State, 641 So.2d 381, 391 & n. 8 (Fla.1994) (noting that "[r]easonable persons could conclude that the facts of the murder are inconsistent with the presence of the two mental mitigators" and that "[a] debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve"). Similarly, here, the facts show an element of planningHoskins placed Ms. Berger in the trunk of the car, drove approximately six hours (stopping for gas and to change a fuse), stopped at his parents' house to borrow a shovel, drove to a remote location nearby, and eventually killed Ms. Berger by manual strangulation. The defense's own expert testified that Hoskins's actions required planning. The facts of the murder are inconsistent with a claim that Hoskins was under the influence of an extreme mental or emotional disturbance.
Finally, the trial court clearly considered the evidence presented. It found low IQ, low mental functional ability, brain abnormalities, and mental age equivalent to be *18 nonstatutory mitigators (although it assigned little weight). Because the trial judge considered all of the evidence and the findings are supported by competent, substantial evidence, we reject Hoskins's claim.

(b) The "Capacity to Appreciate Criminality of Conduct" Mitigator
The trial court likewise rejected the "capacity to appreciate criminality of conduct or to conform conduct to the requirements of law" statutory mental mitigator. Specifically, the trial court rejected the argument that Hoskins lacked the mental and emotional maturity to control his conduct (to stop and extricate himself from the situation):
There may be evidence to support this argument with regard to the rape, but there is simply no evidence to support this argument with regard to the murder. Dr. Krop's testimony is that after the sexual battery, "The rest of what happened is pretty much consistent with an individual who has already engaged in an act which he knows is wrong and trying both to avoid detection and trying to cover up for his crime." When questioned about the Defendant's purpose in binding and gagging Ms. Berger and stuffing her in the trunk of the car, Dr. Krop testified that "I presume the purpose was to avoid detection and to get away from the scene as quickly as he could without being detected." With regard to the drive to Georgia, Dr. Krop testified, "Well, he's driving. He's obviouslyagain, by this point he knows he's done something and he's trying to avoid detection."
(Record citations omitted.)
Again, the defense's own expert testified that by the time Hoskins drove to Georgia (prior to the murder), he knew he had done something wrong and was trying to avoid detection. In Nelson, 850 So.2d at 531, the defendant (who the defense argued suffered from brain damage) removed the victim from her home after sexually assaulting her, drove to two separate orange groves before killing her, and lied to police about the crime. We found the defendant's "purposeful actions . . . indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired." Id. Similarly, Hoskins's purposeful actions in binding and gagging Ms. Berger before placing her in the trunk, driving to his parents' home six hours away, borrowing a shovel, driving to a remote area where he killed Ms. Berger, and then telling his brother he hit a possum when blood was noticed dripping from the rear wheel well are indicative of someone who knows his conduct is wrong. While evidence may suggest otherwise regarding the rape, there was no evidence that because of the frontal lobe impairment Hoskins could not appreciate the criminality of his conduct at the time of the murder. Because the trial court's findings are supported by competent, substantial evidence, we reject Hoskins's claim. See Philmore, 820 So.2d at 936.

2. Aggravating and Mitigating Factors
Hoskins next asserts the trial court erred in failing to attach "real weight" to the mitigating evidence and in concluding that the aggravating circumstances outweighed the mitigating circumstances. Trial courts are in the best position to observe the unique circumstances of a case and have broad discretion in assigning weight to mitigators. Boyd v. State, 910 So.2d 167, 193 (Fla.2005), cert. denied, 546 U.S. 1179, 126 S.Ct. 1350, 164 L.Ed.2d 63 (2006).
As detailed above, the trial court found three aggravators, one statutory mitigator, and fifteen nonstatutory mitigators. The *19 court concluded that any one of the aggravators, standing alone, far outweighed all of the mitigating circumstances. The court considered each of the mitigators advanced by the defense. In addition to the statutory mental mitigators, the trial court properly rejected the lack of injury to Ms. Berger's anus and that the defendant buried the body rather than "callous[ly] dumping it out in the open" as nonmitigating. See Rogers v. State, 511 So.2d 526, 534 (Fla.1987) (recognizing that factors established, but that do not "extenuate or reduce moral culpability," can be rejected). The detailed sentencing order discusses each of the other proffered mitigating circumstances, along with evidentiary support and the weight assigned. There is simply no indication that the trial court abused its discretion in assigning weight to the mitigators. See Hoskins, 702 So.2d at 207-08 (rejecting a similar argument in Hoskins's previous appeal); Globe v. State, 877 So.2d 663, 679 (Fla. 2004) (rejecting the argument that the trial court erred in affording "little" and "slight" weight to nonstatutory mitigating factors); Nelson, 850 So.2d at 532 (finding no merit in the argument that the trial court did not give enough weight to the fifteen nonstatutory mitigators). In addition, both the jury and trial court found that the aggravating circumstances outweighed the mitigating circumstances. It is not our function to reweigh those factors. See, e.g., Connor v. State, 803 So.2d 598, 612 (Fla.2001) (recognizing that weighing the mitigating factors against the aggravating factors is the trial judge's function). Accordingly, we reject this claim.

3. The "Avoid Arrest" Aggravator
Hoskins claims that the trial court improperly found and instructed the jury on the "avoid arrest" aggravator. § 921.141(5)(e), Fla. Stat. (2004) ("The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."). We disagree.
We have delineated the proper circumstances for finding this aggravator:
Where the victim is not a police officer, "the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness," and "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender's thought processes.
In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.
Farina v. State, 801 So.2d 44, 54 (Fla.2001) (citations omitted) (quoting Consalvo v. State, 697 So.2d 805, 819 (Fla.1997)).
While the fact that Ms. Berger could identify her assailant may not alone be sufficient to support a finding that the dominant motive was to avoid arrest, the factor is significant. Id. In addition, we have repeatedly upheld the finding of this aggravator where a sexual battery or robbery occurred in one location and the victim was taken to and killed in another one. See, e.g., Hall, 614 So.2d at 477 ("[W]e *20 have uniformly upheld finding this aggravator when the victim is transported to another location and then killed."); Preston v. State, 607 So.2d 404, 409 (Fla.1992) ("The only reasonable inference to be drawn from the facts of this case is that Preston kidnapped [the victim] from the store and transported her to a more remote location in order to eliminate the sole witness to the crime."). In this case, the jury (by a vote of 12-0) and trial court both found that the killing to avoid arrest aggravating circumstance had been proven.
The facts of this case are very similar to those in Nelson, 850 So.2d at 526. There, the defendant broke into the home of an elderly woman, sexually battered her, placed her in the trunk of her own car, drove around for several hours, and drove to two separate orange groves before he attempted to strangle her with his bare hands, emptied the contents of a fire extinguisher into her mouth, and forced a tire iron into her mouth and through the back of her head. Id. at 518. In upholding the avoid arrest aggravator, along with considering the defendant's own statements, we recognized:
The evidence in this case indicates that Nelson probably could have accomplished the burglary of Brace's home and sexual battery without killing her since Brace likely posed little physical resistance to Nelson: she was 78 years old; she was awakened from her bed in the middle of the night when she was wearing only a nightgown; and at that time her eyeglasses and hearing aids were on her night stand. Further, Nelson easily obtained access to her car. Therefore, it appears that once Nelson immobilized Brace by putting her in the trunk, he secured an uncontested getaway and there was no reason to kill her except to eliminate her as a witness.
Nelson's act of taking Brace to a remote area to kill her also lends support to the finding of the avoid arrest aggravator in this case. . . . Nelson's journey to two different orange groves was intended to find an isolated place to kill Brace, the sole witness to his crimes.
Id. at 526 (citations omitted). Here, the combination of Ms. Berger's ability to identify Hoskins in connection with the rape; Hoskins's ability to leave Ms. Berger's home with little resistance without killing her (due to her age, the fact she was bound and gagged, and easy access to her car); and Hoskins's act of taking Ms. Berger to a remote area to kill her all lead to the conclusion that Hoskins's purpose in killing Ms. Berger was to eliminate the sole witness to his crimes.
The defense contends that the evidence does not establish Hoskins committed the murder to avoid arrest because he thought Ms. Berger was dead when he put her in the trunk. However, as the trial court noted, even if true (which is unlikely given that one need not bind and gag a corpse and the medical examiner testified that Ms. Berger was alive when gagged), Hoskins certainly discovered Ms. Berger was alive when, upon opening the trunk, she kicked at him. He could have fled in her car without killing her, but instead killed her and buried her in a shallow grave. See Knight, 746 So.2d at 435 (recognizing that "if [the defendant] had wanted to perfect his get-away he could have taken the car after he asked [the victims] to exit the vehicle and driven away"). Accordingly, we reject this claim.

4. HAC
Hoskins claims that the evidence does not support the trial court's HAC finding because "there was no showing that the victim was conscious during most *21 of the attack."[6] HAC "focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Duest v. State, 855 So.2d 33, 47 (Fla.2003) (quoting Brown v. State, 721 So.2d 274, 277 (Fla.1998)). On appeal, we review the record to ensure the finding is supported by competent, substantial evidence. Id.
The jury found (10-2) that HAC had been proven. The trial court agreed, concluding, "[T]his Court is hard pressed to think of any way in which the murder of Dorothy Berger could have been any more heinous, atrocious or cruel in every manner in which that aggravating circumstance has ever been defined." This Court previously upheld application of the HAC aggravator to this killing. Hoskins, 702 So.2d at 207. The relevant facts have not changed. Id. at 206-07. If anything, the evidence presented at the resentencing, specifically the testimony from Dr. Krop that Hoskins admitted that Ms. Berger was alive when he opened the trunk, lends further support to the HAC aggravator.
Hoskins asserts, in the face of contrary evidence (including many defensive wounds and wounds on different planes of Ms. Berger's head indicating she moved her head to avoid being hit), that there is no evidence that Ms. Berger was conscious "from the time of the attack at her house to the opening of the trunk in Georgia" and therefore the evidence does not support the HAC finding. However, Hoskins concedes that the evidence shows Ms. Berger was conscious when he opened the trunk and that he then "hit her and strangled her to death." Even if Ms. Berger lost consciousness during the initial attack and the transport to Georgia, the fact that she was conscious for the strangulation is sufficient to support HAC. See, e.g., Bowles, 804 So.2d at 1178 ("Strangulation of a conscious murder victim evinces that the victim suffered through the extreme anxiety of impending death as well as the perpetrator's utter indifference to such torture."); James, 695 So.2d at 1235 (upholding HAC where the defendant picked up the victim by her neck and strangled her as they looked at each other). Accordingly, we reject this claim.

F. Constitutionality of Death Penalty
Hoskins next argues that his sentence is unconstitutional under Ring and Apprendi. We have previously addressed this argument and denied relief. See e.g., Dufour v. State, 905 So.2d 42, 68 (Fla.2005); Fitzpatrick v. State, 900 So.2d 495, 525 (Fla. 2005); Douglas v. State, 878 So.2d 1246, 1264 (Fla.2004). Further, one of the aggravators found by the trial court (and unanimously by the jury) is commission during a robbery, sexual battery, and kidnapping.[7] The jury found Hoskins guilty of these crimes as charged in the indictment and we affirmed those convictions. Hoskins, 702 So.2d at 203. The trial judge *22 determined that any one of the aggravating circumstances alone far outweighed all of the mitigating circumstances. Accordingly, we reject this claim as we have similar claims.

G. Proportionality
Although Hoskins does not raise the issue of proportionality, we have an independent obligation to determine whether death is the appropriate punishment. See, e.g., Philmore, 820 So.2d at 939. The jury recommended death by a vote of 11-1. The trial court (as well as the jury) found three statutory aggravators: (1) commission during the course of or in flight after a robbery, sexual battery, or kidnapping; (2) commission for the purpose of avoiding arrest; and (3) HAC. The latter is considered one of the most serious aggravators. See, e.g., Douglas, 878 So.2d at 1262 (recognizing that "HAC is one of the most serious aggravators in the statutory sentencing scheme"). The trial court also found one statutory mitigating circumstance, the defendant's mental age equivalent (given little weight), and fifteen nonstatutory mitigating circumstances, most of which were given little weight. We find the sentence proportional to other death sentences this Court has upheld. See, e.g., Everett v. State, 893 So.2d 1278, 1288 (Fla. 2004) (upholding a death sentence where the victim was beaten, raped, and then suffocated after having her neck broken where the trial court found three statutory aggravators(1) convicted felon under sentence of imprisonment; (2) commission during the course of a sexual battery or burglary; and (3) HACfive statutory mitigators, and four nonstatutory mitigators), cert. denied, 544 U.S. 987, 125 S.Ct. 1865, 161 L.Ed.2d 747 (2005); Douglas, 878 So.2d at 1262-63 (upholding a death sentence where the victim was sexually battered and beaten and the trial court found two aggravatorsHAC and commission during the course of a sexual batteryone statutory mitigator and sixteen nonstatutory mitigators); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (upholding a death sentence where the victim was sexually battered and strangled and the trial court found two aggravating factorsprevious violent felony conviction and HACone statutory mitigator, and twenty-six nonstatutory mitigators); Belcher v. State, 851 So.2d 678, 686 (Fla.2003) (upholding a death sentence where victim was sexually assaulted and then strangled and drowned where the trial court found three aggravating factors(1) previous violent felony conviction; (2) commission during the course of a sexual battery; and (3) HACand fifteen nonstatutory mitigators).

III. Conclusion
Based on the foregoing, we affirm Hoskins's sentence of death.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] We rejected Hoskins's sole guilt phase issue on appeal"that he was deprived of his right to be tried by a fair and impartial jury drawn from a representative cross section of the community" because the trial court permitted the court clerk to excuse certain jurorsas procedurally barred. Hoskins, 702 So.2d at 205-06.
[2] The trial court found each mitigating circumstance pursuant to section 921.141(6)(h), Florida Statutes (2004), "any other factors in the defendant's background that would mitigate against imposition of the death penalty." The trial court also found mitigating circumstance (8) pursuant to section 921.141(6)(g), "[t]he age of the defendant at the time of the crime." Thus, the trial court found one statutory mitigator and fifteen nonstatutory mitigators. The trial court found mitigators (14) through (16) based on the hearing held pursuant to Spencer v. State, 615 So.2d 688, 691 (Fla.1993) (holding that the trial court should conduct a hearing to allow the parties to be heard, afford the parties an opportunity to present additional evidence, allow the parties to comment on or rebut information in any presentence or medical report, and afford the defendant an opportunity to be heard in person).
[3] Hoskins asserts that Ms. Harp was the only African-American on the panel. Other than this exchange regarding Ms. Harp, the record does not reveal the races of any of the other potential jurors or the racial composition of the jury seated. However, because the defense pointed to jurors Mayhue, Ingraham, Wilborn, Nopper, Loftis, and Campione as similarly situated at trial, it is at least implied that these jurors are not African-American.
[4] It appears that Hoskins failed to preserve this claim by failing to renew his objection or accept the panel subject to the earlier objection. See, e.g., Zack v. State, 911 So.2d 1190, 1204 (Fla.2005). However, because the parties did not brief this issue, and because we reject the claim on the merits, we do not address it.
[5] The standard instructions do not include the phrase "for twenty-five years," but note that "[f]or murders committed prior to May 25, 1994, the penalties were different; . . . this instruction should be modified to comply with the statute in effect at the time the crime was committed." Hoskins murdered Ms. Berger in October of 1992. The statute in effect at the time provided, "A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than 25 years. . . ." § 775.082(1), Fla. Stat. (1991).
[6] Hoskins also claims that "[b]ecause of the defendant's extreme mental impairment and state of rage, there can be no showing that the defendant intended for the victim to suffer or even intended the method for the killing." The intent to harm Ms. Berger in a heinous, atrocious, or cruel manner is not a required element of the aggravator. See, e.g., Orme v. State, 677 So.2d 258, 263 (Fla.1996) ("[S]trangulation creates a prima facie case for [HAC]; and the defendant's mental state then figures into the equation solely as a mitigating factor that may or may not outweigh the total case for aggravation."); Francis, 808 So.2d at 135 (rejecting argument that defendant was mentally ill at the time and thus could not have intended to cause suffering or torture because intent is not a necessary element of the aggravator). Thus, we summarily reject this argument.
[7] We have disapproved of special verdict forms detailing jurors' determinations concerning aggravating factors. State v. Steele, 921 So.2d 538, 544 (Fla.2005). However, here, the parties agreed to their use and neither party has raised it as an issue on appeal.